Joseph A. **BONJORNO,** George M. Kerr, Jr. and Barbara K. Clisby, as Transferees in Liquidation and Dissolution of Columbia Metal Culvert Co., Inc.

v.

KAISER ALUMINUM & CHEMICAL CORP. and Kaiser Aluminum & Chemical Sales, Inc.

Civ. A. No. 74–122.

United States District Court, E. D. Pennsylvania.

June 17, 1981.

Michael M. Baylson, Duane, Morris & Heckscher, Philadelphia, Pa., for plaintiffs.

Richard P. McElroy, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for defendants.

## MEMORANDUM and ORDER

SHAPIRO, District Judge.

### INTRODUCTION

Post-trial motions in this antitrust litigation are before the court pursuant to a limited remand order of the United States Court of Appeals for the Third Circuit. Defendants Kaiser Aluminum & Chemical Corp. ("KACC") and Kaiser Aluminum & Chemical Sales, Inc. ("KACSI") move for a judgment notwithstanding the verdict or, in the alternative, for a new trial, following a jury verdict in favor of Columbia Metal Culvert Co., Inc. ("Columbia")[1] finding KACC and KACSI in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and awarding damages in the sum of $1,815,000. Judgment was entered for the plaintiff in the trebled amount of $5,445,-000.

Columbia originally brought suit against KACC and KACSI and former Columbia salesman Robert A. Kennedy and the company he owned, Kennedy Culvert and Supply, an independent distributor of culvert and drainage pipe manufactured by KACSI. The complaint alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14. At the jury trial held before the Hon. Edward N. Cahn, a directed ver-

dict for all defendants was entered at the close of Columbia's case on the ground that Columbia had not made out a *prima facie* case of conspiracy in restraint of trade between KACC/KACSI and the Kennedy defendants. The district court further found that the product market was not limited to aluminum culvert pipe as Columbia had maintained but included culvert pipe whether made from either aluminum or steel. Since the Kaiser share of the aluminum and steel culvert pipe market was concededly not significant, the court held that Kaiser could not have monopoly power. The court further found that no *prima facie* violation of Section 3 of the Clayton Act had been proven. *See, Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chemical Corp.*, Civil Action No. 74-122 (July 20, 1977).

On appeal by Columbia, the Third Circuit reversed in part and affirmed in part. The Court affirmed the grant of a directed verdict in favor of the Kennedy defendants on the issue of conspiracy. The Court also upheld the district court's finding that no *prima facie* case of a Clayton Act violation had been proven. However, the grant of a directed verdict in favor of defendants KACC and KACSI was reversed. The Court held that:

(1) There was sufficient evidence to allow a jury reasonably to conclude that a relevant market for Sherman Act purposes was composed of aluminum culvert only rather than culvert of either aluminum or steel;

(2) There was sufficient evidence to go to the jury on the charge that KACSI and KACC violated § 2 of the Sherman Act by monopolizing or attempting to monopolize the aluminum culvert market; and

(3) There was sufficient evidence to go to the jury on the charge that KACC and KACSI conspired in restraint of trade in violation of § 1 of the Sherman Act.

---

1. Upon liquidation of Columbia, all of its claims, rights and interest in this litigation were assigned to its shareholders, Joseph A. Bonjorno, George M. Kerr, Jr. and Barbara K.

Clisby; the current named plaintiffs were substituted as parties pursuant to Fed.R.Civ.P. 25(c) by the court's Order of May 30, 1980.

*Columbia Metal Culvert Company, Inc. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20, 37 (3d Cir. 1978), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978).

A bifurcated trial before this court resulted in a determination of defendants' liability in answer to special interrogatories (attached to this opinion as Appendix A); the jury found that the relevant product market was for aluminum culvert pipe, that defendants KACC and KACSI had monopolized, attempted to monopolize, and conspired to monopolize this market in violation of Section 2 of the Sherman Act; that KACC and KACSI had conspired in violation of Section 1 of the Sherman Act; and that Columbia had been injured by the unlawful acts of KACC and KACSI.

The jury then awarded damages in the amount of $1,048,000 for lost profits, $710,000 for the destruction of Columbia as a going concern, and $57,000 for the cost of extra metal (relating to Columbia's spiral machine for making pipe), a total of $1,815,000, which trebled resulted in a judgment of $5,445,000. Following a second appeal, the case was remanded to the district court for disposition of post-trial motions.[2] (Docket Entry # 426). Columbia having won a jury verdict at trial, we consider the following facts in the light most favorable to plaintiff.

Columbia was a company specializing in the manufacture and marketing of aluminum culvert pipe with a plant in Vineland, New Jersey. KACC manufactures aluminum sheet and coil from which aluminum culvert pipe is constructed and conveys these materials to its wholly-owned subsidiary KACSI, which in turn sells the sheet and coil to pipe manufacturers such as Columbia. KACSI also fabricates and sells aluminum culvert pipe itself in competition with the fabricators to whom it supplies sheet and coil.

These three entities had a successful business relationship for many years during which Kaiser was Columbia's main material supplier. Beginning in 1971, a four-pronged effort took place to put Columbia out of business in retaliation for Columbia's placing of aluminum orders with Reynolds Aluminum. This KACC/KACSI effort included a refusal to sell to Columbia, a decision to locate a new culvert manufacturing plant within fifty miles of Columbia's plant, setting up Robert A. Kennedy, Columbia's best salesman, in business as an independent distributor of KACSI products, and a "price squeeze" by KACC and KACSI, accomplished by transferring sheet and coil from KACC to KACSI below cost. This allowed KACSI to make a profit on sales of pipe at prices which Columbia could not match; the price of aluminum was increasing and the supply of the metal was severely limited.

The Kaiser defendants move this court for a judgment notwithstanding the verdict, on the ground that Columbia produced insufficient evidence to support the verdict in several material respects. In the alternative, defendants move for a new trial on the ground that the verdict was contrary to law, against the weight of the evidence, and that the court erred in certain evidentiary rulings, in jury instructions, and in submission of certain interrogatories to the jury.

In ruling on a motion for judgment N.O.V., "it is the duty of the trial court to take that view of the evidence most favorable to the party against whom the motion is made, and from that evidence, and the inferences reasonably and justifiably to be drawn therefrom, determine whether or not, under the law, a verdict might be found for him." 6A *Moore's Federal Practice* § 59.08[5] at pg. 59–152 (1979). On the other hand, a motion for new trial, on the ground that the verdict was against the weight of the evidence, is addressed to the sound discretion of the trial court. *Id.*

## POST–TRIAL MOTIONS—LIABILITY

■ Defendants' contentions must fail in view of the Circuit Court's opinion in *Co-*

---

**2.** A direct appeal was taken because defendants failed to file post-trial motions timely. The Court of Appeals, upon defendants' motion, allowed a limited remand to this court to have the benefit of the trial judge's views upon the issues in contention.

lumbia Metal Culvert Company, Inc. v. Kaiser Aluminum & Chemical Corporation, 579 F.2d 20 (3d Cir. 1978), cert. denied, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978) and the doctrine of the law of the case.

As noted in Otten v. Stonewall Ins. Co., 538 F.2d 210, 212 (8th Cir. 1976):

> This court has repeatedly held that the decision on former appeal is the 'law of the case' on a question presented in that former appeal, unless the evidence introduced at the subsequent trial is substantially different from that considered on the first appeal, and must be followed in all subsequent proceedings in such case in both district and appellate courts, unless the decision is clearly erroneous and works manifest injustice. (emphasis supplied, citations omitted).

See, e. g., United States v. American Bag & Paper Corp., 609 F.2d 1066, 1067, n.3 (3d Cir. 1979) (determination by panel of Court of Appeals was law of the case and later panel was bound by it); Skehan v. Board of Trustees of Bloomsburg State College, 590 F.2d 470, 482 (3d Cir. 1978), cert. denied, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979) (Court of Appeals' prior opinions were law governing the case with respect to question of whether it was permissible to remand plaintiff's due process claims to district court and district court's observations on remand were of no effect); Chlystek v. Kane, 540 F.2d 171, 173 (3d Cir. 1976) (Court of Appeals governed by law of the case from prior appeal with respect to whether a substantial federal question was present); Spock v. David, 502 F.2d 953, 955 (3d Cir. 1974), reversed on other grounds, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (on essentially the same record as was before the Court of Appeals prior to remand, both the district court on remand and the panel of the Court of Appeals on appeal following remand were bound, with respect to issue decided by the Court of Appeals prior to remand, by decision on that issue as the law of the case); A. M. Webb & Co. v. Robert P. Miller Co., 176 F.2d 678, 680–81 (3d Cir. 1946) (on trial after remand of case, questions settled by Court of Appeals could not be relitigated);

Moyer v. Aetna Life Insurance Co., 126 F.2d 141, 143 (3d Cir. 1942) (law of case on prior appeal as to sufficiency of the evidence on certain points precluded reconsideration thereof upon defendant's appeal of district court denial of judgment N.O.V. after second trial).

This court is bound by the Third Circuit's decision on issues presented and decided explicitly or implicitly in the prior appeal. See, Todd and Company, Inc. v. SEC, 637 F.2d 154 (3d Cir. 1980). For this reason we reject Kaiser's initial contention in its brief in support of post-trial motions, that because KACSI is "wholly owned and controlled" by KACC (Defendant's Brief in Support of Motions at 2), the two corporate entities are incapable of a conspiracy for lack of the requisite plurality of actors. The Third Circuit explicitly rejected this argument as "not well-founded in law," and reaffirmed the viability of the "intra-enterprise conspiracy theory" as applied to separate corporate entities. Columbia Metal, supra at 33. See, Cromar Company v. Nuclear Materials and Equipment Corp., 543 F.2d 501, 511 (3d Cir. 1976) (absence of the appearance of competition between parent corporation and wholly-owned subsidiary not a bar to Section 1 Sherman Act liability.) This court may not reconsider that determination.

A similar fate befalls Kaiser's contention that there was insufficient evidence to support a finding of an unlawful conspiracy between KACC and KACSI, insufficient evidence to support a finding that KACC or KACSI had a specific intent to monopolize or to wilfully maintain monopoly power, insufficient evidence to support a finding that the relevant product market was aluminum culvert and drainage pipe alone, and insufficient evidence to support the court's charge on the price squeeze issue. The Third Circuit explicitly found the evidence sufficient to allow a jury to find for Columbia on each of these points. Columbia, supra at 37.

The law of the case doctrine precludes a reconsideration of that determination un-

less the evidence at the second trial was *substantially* different from that considered by the appellate court. *Otten, supra.* However, the evidence which the Court of Appeals found sufficient as to each of these points was substantially repeated in the second trial.

### Product Market

The evidence persuasive to the Third Circuit on the product market issue, *Columbia, supra* at 29–31, essentially repeated itself at the second trial. For example, there again was testimony that aluminum is a specialty material[3] and that there are specialized vendors of aluminum products.[4] Several witnesses testified that the physical properties of the three types of manufactured culvert pipe, steel, concrete and aluminum, differ significantly.[5] Because of these differences, evidence at the second trial again showed that specifications for construction projects require one type of culvert rather than another.[6] From this evidence a jury might infer that distinct markets exist for aluminum, steel and concrete pipe, at least from the contractor's point of view. *See, Columbia, supra,* at 28.

The record here shows, as did the record before the Court of Appeals, that a jury would not act unreasonably in finding that, "patterns of action on the part of engineers who specify the type of culvert to be used establish aluminum as a separate market."

Columbia, *supra* at 28. Again, there is testimony that price was not a crucial factor in these engineering decisions[7] and that the three culvert products are neither interchangeable nor in competition from an engineering standpoint.[8]

Defendants also argue that steel and aluminum culvert may share the same production facilities as an indicia of products in the same market for Sherman Act purposes. The fact that the same production facilities can be used to turn out steel and aluminum culvert and even the fact that companies often manufacture both products is insufficient to preclude the existence of separate markets as a matter of law; *Columbia, supra,* at 29 n. 30.

Defendants vigorously assert that the evidence does not support the jury's finding of an aluminum culvert product market. (*See,* Defendants' Brief in Support of Motions at pp. 99–109). Defendants point to extensive testimony, particularly that of defendants' expert, Dr. Epstein, supportive of their view. But the jury rejected defendants' testimony on these points and accepted that of the plaintiff; the Court of Appeals has already determined that plaintiff's evidence would reasonably support such a jury finding.

Thus this court accepts the jury finding of an aluminum culvert pipe product market, as sufficiently supported by the evidence.

---

3. *E. g.,* N.T. 248 (Bonjorno) ("... aluminum was always a specialty product. It was during the sixties, and it was during the early seventies, and it was at the period and point in time that we're talking about ...."); N.T. 681 (Arvay) ("... aluminum again becomes a very highly specialized product ...."); *See,* Plaintiff's Brief in Opposition to Defendants' Motions at 9.

4. *E. g.,* N.T. 2848 (specialized in aluminum "as far as a storm drainage product ...."); N.T. 17 (Bonjorno).

5. *E. g.,* N.T. 874, 879, 882–883, 885–886, 888–889, 893–894 (Elam). *See,* Plaintiff's Brief in Opposition to Defendants' Motions at 9.

6. *E. g.,* N.T. 904, 915, 916 (Elam); N.T. 1698 (Price).

7. *E. g.,* N.T. 919 (Elam) ("... you are going to specify that product in most instances where price is not even a factor ..."); N.T. 680 (Arvay) ("... as far as the price situation is concerned, that is not the concern to them ...."); N.T. 1701 (Price); *See,* Plaintiff's Brief in Opposition to Defendants' Motions at p. 8.

8. *E. g.,* N.T. 1408 (Chafin) ("... it [aluminum] has inherent characteristics which are different from the other materials ..."); N.T. 918 (Elam):
   "Q. Now taking your professional group, the Drainage Engineers and engineers who design drainage systems and design culvert and specify different commodities of culvert, in your opinion, does that group view these products, steel, aluminum and concrete as interchangeable?"
   "A. No, I don't think they do."

### Unlawful Conspiracy Between KACC and KACSI

The evidence found sufficient to prove unlawful conspiracy between the defendants, *Columbia, supra* at 34–35, was also placed before the jury in the second trial. Again there was evidence that KACC and KACSI combined to impose a price squeeze. For example, there was evidence from which the jury could infer that Collins of KACSI had no part in setting the specification price of coil, which was a KACC price (N.T. 171, 1972, 1957), that Collins was chastised by KACC for not getting prices up high enough (P–950, N.T. 2277, 2281, 2560), that Collins reported to the Sheet and Plate Division of KACC (N.T. 2307, 1718–20), that someone higher than Collins was responsible for the price increase crucial to this litigation (N.T. 1972), that KACC transferred coil to KACSI below cost (N.T. 1964, P–823) and that Collins' request for a plant in New Castle, Delaware was approved by KACC (N.T. 1792, 2114, 2317, 2372, 1976, P–204, 210). *See,* Plaintiff's Brief in Opposition to Defendants' Motions at pp. 12–13. From this and other information adduced at trial, the jury might again infer that "the pricing policies of KACSI were not independent . . . but rather arrived at jointly with KACC." *Columbia,* 579 F.2d at 35. Although there was evidence from which a contrary finding might have been made (*see,* Defendants' Brief in Support of Motions at pp. 32–59), we find the evidence was sufficient to support the jury's conclusion that KACC and its wholly-owned subsidiary, KACSI, conspired in violation of the Sherman Act.

### Intent to Monopolize

Defendants argue that plaintiff's evidence was insufficient to support the jury's finding that the Kaiser defendants monopolized or attempted to monopolize in violation of Section 2 of the Sherman Act (*see,* Defendants' Brief in Support of Motions at pp. 60–99). Judge Cahn's directed verdict for defendants on this issue at the first trial resulted from his related finding that steel and aluminum, rather than aluminum culvert pipe alone, must constitute the relevant product market. The Third Circuit, as discussed above, found that it was not unreasonable to conclude that culvert pipe alone constituted a relevant market, and therefore that "the foundation of the directed verdict on the § 2 count collapses." *Columbia,* 579 F.2d at 31. The Court of Appeals also stated that there was sufficient evidence to infer that KACSI, an entity controlling 80% of the market, attempted to drive Columbia out of business. *Columbia,* 579 F.2d at 31. That same evidence persuasive to the Court of Appeals was presented to the jury at the second trial. Holmes Collins' threat to place an aluminum culvert plant near Columbia if Columbia purchased from Reynolds, and the later placement of a plant in New Castle, Delaware (N.T. 1228) that was originally planned for Virginia, (N.T. 1533, 1540–1541, 1730), were submitted to the jury. Again, there was evidence that, "transportation of culvert is a significant item of expense for the product in question and a local manufacturer of culvert has an advantage over one whose plant is at a distance from the place of delivery" (*Columbia, supra* at 31), from which the jury might infer intentional harm caused Columbia by Kaiser's placement of its plant (N.T. 2317–2318, 2840). Again, an inference could be drawn from evidence that the Delaware KACSI plant sold culvert at lower prices than other plants even though Delaware costs were no lower (N.T. 1734, 2544–2545), that KACC transferred sheet and coil to KACSI at an accounting price less than production cost and well below market price (N.T. 1964, 3654), and that Collins of KACSI extended credit to Kennedy, formerly a Columbia salesman, against the recommendation of the KACSI credit department (N.T. 1849–1863, 2525–2529, 2842–2849, 2854, 2997, Exhibits P–75, P–24, P–5). The Arvay testimony, specifically noted by the Third Circuit, *Columbia, supra* at 31, n.43, again supported plaintiff's theory (N.T. 719, 729, 752). Finally, an inference that Kaiser controlled more than 80% of the relevant market was again reasonably supported by the evidence. (N.T. 73–75, 780, 1261, 1809, 1810, 1814,

2509, Exhibit P–201). Therefore, the evidence was sufficient to support the jury's conclusion that the defendants monopolized or attempted to monopolize in violation of Section 2 of the Sherman Act.

In summary, on the liability issues, the evidence on retrial was not substantially different from that considered by the appellate court and must be deemed sufficient to support the jury's finding in favor of the plaintiff. Moreover, not only was the evidence sufficient, the court in the exercise of its discretion does not find the jury's determination so against the weight of the evidence as to shock the conscience of the court. Therefore, a new trial would be denied on all issues of liability. The court has carefully considered all other grounds raised by defendants in their motion for judgment notwithstanding the verdict and, with the exception of ground eleven (11) relating to damages and discussed *infra*, determines them to be without merit.

## DAMAGES

The trial of this matter having been bifurcated, after the jury verdict on liability against defendants, two days of testimony on damages followed; the jury, again upon answers to special interrogatories (attached hereto as Appendix B), then found damages in favor of plaintiff in these amounts: 1) $57,000 for increased costs of metal; 2) $1,048,000 for lost profits; and 3) $710,000 for the reduction in the value of Columbia as a going concern. The total damage award by the jury was $1,815,000. The jury's award was trebled in accordance with the remedy provided in Section Four of the Clayton Act, 15 U.S.C. § 15; the final judgment in plaintiff's favor is in the amount of $5,445,000.

Defendants raise numerous objections as to the award of damages.

*Causation*

Defendants argue that plaintiff did not establish the requisite causal link, under Section Four of the Clayton Act, between the financial damage suffered by Columbia and the defendants' violation of the antitrust laws. Defendants assert that they are entitled to judgment in their favor if the damages to the plaintiff were caused in whole or in part by factors other than defendants' violations of the antitrust laws.[9] Defendants assert that Joseph Bonjorno, Columbia's chief witness and shareholder, on cross-examination identified several reasons, other than defendants' activities, for losses suffered by Columbia during the relevant time period. Among those causes cited by defendants are: the recession in the construction industry,[10] a nationwide aluminum shortage,[11] the inability of Columbia to obtain price protection from suppliers,[12] and the unstable financial condition of Columbia's chief financial backer, George Kerr.[13]

Damages attributable to an antitrust violation are recoverable even when factors other than defendant's wrongful acts alone may have contributed to the plaintiff's injury. 15 Antitrust Laws and Trade Regulation § 115.01[2] (1978). In this case there was sufficient evidence, if accepted by the jury, to show that Columbia's business decline was caused by Kaiser's illegal activity. Mr. Bonjorno stated repeatedly, both on direct and on cross-examination, that the injury to Columbia was caused by Kaiser's illegal activity.[14] He also stated that in projecting damage figures he had considered the legal competition of others in the marketplace. (N.T. 3971). He further stated that the damage projections did not go beyond a point where it was simply too difficult to determine "who was responsible for what" (N.T. 3858). When cross-examined as to other possible causal factors in Columbia's decline, Bonjorno either asserted

9.   *See,* Defendants' Brief in Support of Motions for Judgment N.O.V. or for a New Trial at p. 11 (citing cases).

10.   *See,* N.T. 3903–3905.

11.   *See,* N.T. 3908, 3909.

12.   *See,* N.T. 3911–3918.

13.   *See,* N.T. 3919, 3920.

14.   *E. g.,* N.T. 3864, 3865, 3902, 3904.

that these factors were not significant or that Kaiser's illegal activity had made Columbia particularly vulnerable to troubles that, absent such wrongdoing, would not have created financial problems.[15] The jury had before it, through this adept cross-examination, those other factors. However, the jury found that Kaiser's illegal activity caused the financial harm suffered by Columbia. Damages for injury by antitrust violations may be implied even though other factors may have contributed to the injury. *See, Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264–265, 66 S.Ct. 574, 579–580, 90 L.Ed. 652 (1946); *Switzer Brothers, Inc. v. Locklin*, 297 F.2d 39 (7th Cir. 1961), *cert. denied*, 369 U.S. 851, 82 S.Ct. 934, 8 L.Ed.2d 9 (1962). Here, plaintiff did show, with the requisite reasonable certainty, an injury in consequence of Kaiser's conduct. *See, Pitchford v. PEPI, Inc.*, 531 F.2d 92 (3d Cir. 1976), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976). Judgment notwithstanding the verdict on causation would be improper.

### Duplication in Damages Award

Defendants assert that, when the jury returned a verdict of $1,048,000 for loss of profits during 1974–1977 and $710,000 for the reduction in the value of plaintiff's business as a going concern as of May 1, 1977, Columbia was awarded a double recovery for the same loss. Defendants' theory for this duplication argument is not clear but seems to include these contentions. Defendants first argue that plaintiff's recovery of lost profits in this action together with the amount received from the sale of Columbia's assets to Howmet in 1977 for $574,000 fully compensated plaintiff for its losses because the value of Columbia as a going concern was the amount received from Howmet at the time of sale. Receiving damages for business as a going concern under this theory duplicates the money paid Columbia by Howmet in 1977 *not* the lost profits awarded by the jury at trial. A part of this argument is that either Howmet

paid for Columbia's total going concern value as of May, 1977 (including goodwill) or that Howmet bought only Columbia's assets; *i. e.*, all Columbia had left at that time, as Columbia itself asserts. If the latter is the case, Kaiser argues that projected lost future profits should not add to a going concern value since Columbia, defunct as of 1977, could have no future profits.

Defendants next contend that the method of calculating the damage to Columbia as a going concern caused a duplication between the two theories of damage recovery. Defendants state that the same figures used to calculate past lost profits, were used to project Columbia's profits into the future, post 1977, to arrive at a going concern value. (A going concern value indirectly reflects future profits as "[t]he current market value of a business is, in theory, the discounted present value of the estimated flow of future earnings." *Glauser Dodge Co. v. Chrysler Corp.*, 418 F.Supp. 1009, 1023 (D.N.J.1976), *reversed on other grounds*, 570 F.2d 72 (3d Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978) *rehearing denied*, 438 U.S. 908, 98 S.Ct. 3128, 57 L.Ed.2d 1150 (1978).) This, defendants maintain, created an impermissible duplication since the same figures establish both damage theories.[16] Finally, defendants argue that a recovery for going concern value and lost profits is generally not allowed.

We will deal with the last contention first. As noted in 15 Antitrust Laws and Trade Regulation § 115.03[1] (1978), "there are three types of damages that a successful antitrust plaintiff may recover under Section 4: (1) increased costs; (2) lost past net profits; and (3) reduction in the value of the business. *Absent unique circumstances, these three types are not duplicative of each other.*" (emphasis supplied). Numerous cases support this general proposition. *See, Story Parchment Co. v. Paterson Parchment Paper Company*, 282 U.S. 555, 561, 51 S.Ct. 248, 250, 75 L.Ed. 544

---

**15.** *E. g.*, N.T. 3907, 3908, 3910, 3912, 3913.

**16.** *See*, Defendant's reply brief at p. 51.

(1931) ("[t]he trial court submitted to the jury for consideration only two items of damages, (1) the difference, if any, between the amounts actually realized by petitioner and what would have been realized by it from sales at reasonable prices except for the unlawful acts of the respondents' and (2) the extent to which the value of the petitioner's property had been diminished as the result of such acts."); *Glauser Dodge Co. v. Chrysler Corp.*, 418 F.Supp. 1009, *supra*, (involved damages for both lost profits and going concern value); *Eiberger v. Sony Corp. of America*, 622 F.2d 1068, 1081 (2d Cir. 1980) ("[t]he district court ruled that ABP was entitled to compensation for two categories of injuries—lost profits on sales that were prevented prior to the termination of its Sony dealership, and the reduction in the value of ABP's business resulting from the termination"); *Copper Liquor, Inc. v. Adolph Coors Co.*, 624 F.2d 575 (5th Cir. 1980) (lost profits and goodwill loss, determined in part by reference to potential for future profits); *Albrecht v. Herald Co.*, 452 F.2d 124 (8th Cir. 1971) (sufficient compensation included damages in amount of profits lost prior to the forced sale of the business *plus* its full market value, absent the illegal practices). Thus in this case, absent some unique circumstance, it is clear that plaintiff is entitled to both the lost past profits as of the time of the sale to Howmet and the value of the business, as it would have been absent defendants' violation of law, in May of 1977 upon Columbia's termination.

█ Defendants claim that the method of calculating going concern value created duplication in the damages award since going concern value was calculated, in part, by using the past lost profit figures in order to project potential future profits. Defendants assert that this method allowed plaintiff to recover its lost profits twice. However, several cases, discussing damages calculations in the antitrust area, have explicitly or implicitly endorsed this method of determining going concern value. For example, in *Eiberger, supra*, at pp. 1081–1082, n.25, the court stated:

25. Although it is unclear, Sonam may also be arguing that the district court erred when it included in the one-year base period figures an amount for profits that ABP would have earned on sales lost as a result of Sonam's intimidation. Such an argument is clearly incorrect. ABP is entitled to an award that covers all of the profits it would have earned but for Sonam's violation: these include both the profits lost while ABP was still an authorized dealer, and the profits it would have earned after that point, which when capitalized equal 'going concern' value of the lost portion of ABP's business. *See, Farmington Dowel Prods. Co. v. Forster Mfg. Co.*, 421 F.2d 61, 80–82 (1st Cir. 1970). *To exclude lost profits from the base period figures used to project the latter component would be to reduce plaintiff's award for the later period precisely because defendant's intimidation had been successful in the base period. Such a reduction would obviously be improper.* (emphasis supplied).

Similarly, in this case, it was appropriate that the calculation of Columbia's value as a going concern included as its base figure, not the past profits depressed by defendants' violations, but the past profit history as it would have been but for the violation.

Of similar import is *Copper Liquor, Inc. v. Adolph Coors Co., supra* at 579 n.9, where the court described the calculation of a retail liquor store's goodwill value, in a case where plaintiff sought both lost profits and goodwill:[17]

9. Relying on the assumption that the store reduced its markup from 25 percent to 15 percent in 1966, Green calculated the store's goodwill value by adding the lost gross profits for each year of the store's operation to the net profits for the store as they appeared on the store's corporate income tax returns. The sum of

---

17. "Valuing a business's goodwill, of course, is a subjective determination that takes into consideration factors such as a business's age, profit history, customers, and *potential for future earnings.*" (emphasis supplied). *Copper Liquor Co., supra*, at 579 n.8.

lost gross profits and net profits for the four years, 1967 to 1971, was identified as adjusted net income. Adjusted net income, in the amount of $100,046, was divided by the number of years to obtain average net income. Mr. Green then subtracted from average net income the store's return on capital computed at 6 percent per year to derive average net income after return on investments. This figure, $21,980, was multiplied by five to arrive at a goodwill value of $109,899.

Again past lost profits were taken into account in the figure from which goodwill was projected. Finally, by way of example, the district court in *Glauser, supra* at 1023 n.14, made the following observations on this point:

14. Since the challenged practices continued for several years leading up to the elimination of Glauser Dodge from the marketplace, the plaintiff properly presented to the jury estimates of the value of the business as a going concern based upon its actual performance in prior years *and, alternatively, based upon the earnings which the business would have had absent the defendants' unlawful conduct.* (emphasis supplied).

18. Defendants' cited cases can be read to support plaintiff's position. *Rea v. Ford Motor Company*, 497 F.2d 577 (3d Cir. 1974), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974), involved a finding of double recovery under the Automobile Dealer's Act where the damages for lost future profits did not reflect the fact that plaintiff had sold certain assets for $60,000. Defendants cite it for that proposition. However, the court in *Rea*, at 587 n.19, stated that "neither the trial judge's instructions on damages nor Dr. Staelin's estimate made mention of or took into account the benefit 22 Ford received from the cash . . . ." Clearly the Howmet purchase price was taken into account in this case; defendants' in their Reply Brief at p. 51 note Dr. Kuehn's assumptions regarding the Howmet sale in the going concern value computation. Also, in *Farmington Dowel Products Co. v. Forster Mfg. Co.*, 421 F.2d 61 (1st Cir. 1969), *supp. order*, 421 F.2d 91 (1st Cir. 1979), cited by defendants, the court allowed plaintiff to recover both its lost profits to the date it went out of business and the going concern value of the plaintiff on that date.

19. N.T. 3864 (Bonjorno):

In the instant situation, then, we find no merit to defendant's contention that the method of computation used in this case created a duplication.[18] Rather, by adding Columbia's estimated profit figures in those prior years and then projecting forward for future profits, Columbia quite appropriately measured its value as a going concern from its estimated 1977 condition had there been no prior damage caused by defendants. Necessarily, this method creates a projection based upon a projection but it is defendants' prior misdeeds that make such a formulation necessary.

Finally, we consider defendants' contention that Columbia's recovery for going concern value duplicated the amount received in 1977 when Columbia transacted its sale to Howmet. Plaintiff asserts that the transaction with Howmet was a sale of assets only, since Columbia, having been destroyed as a business by Kaiser, had no goodwill value left. Both Bonjorno[19] and Dr. Kuehn so testified.[20] If this is the case, Kaiser argues that there was no reasonable prospect that Columbia would have earned profits in the future. However, Columbia's value as a going concern, that is its market value to Howmet, would certainly have

"A. Well, we—as long as we were operating we had our good name. We had our reputation and our ability to manufacture a high quality product, our ability to work and get our product specified. This as all part of Columbia Metal and its good name in the aluminum culvert pipe industry in the trading area, and they effectively destroyed this.
Q. Who is they?
A. Kaiser Aluminum."

20. N.T. 4041 (Kuehn):
"Q. Well, do you make an assumption as to what the actual value was as a going concern on May 31, 1977?
A. Yes.
Q. What is that?
A. Well, the assumption is that the value of the firm on that date was limited to physical assets, and consequently that there was no operating value beyond the sheer value of the assets that existed.
Q. And based on what you know about this case, is that a reasonable assumption?
A. Given that—given the actual operation of the firm in the previous years in the damaged state, I would say yes."

been greater if its goodwill, and thus its potential for future profit, were intact.[21] If Howmet paid only for tangible assets, Columbia did not receive the worth of its business absent the violation which destroyed its goodwill. If Columbia indeed had no reasonable prospect of future profits, that indicates more damage to Columbia, not less damage to its going concern value.

As an alternative characterization, defendants assert that whatever intangible value Columbia had, assuming it had some, was paid for by its 1977 purchase by Howmet. It was plaintiff's express assumption that Howmet bought only tangible assets (N.T. 4041) and that its projection of "... the value of the business was computed in terms of whether the rates of return from the operation of this business in the absence of damage produced or would have produced a return in excess of the profits that might be expected from the tangible assets alone. In other words, was there additional profit that would then be attributed to intangibles which would indicate some value of goodwill relative to the operation of the business." (N.T. 4039–4040). *Compare, Pitchford v. PEPI, Inc.*, 531 F.2d 92 (3d Cir. 1975) (failure to deduct Mr. Pitchford's salary as a cost of operation from data used to project potential earnings for the purpose of evaluating the lost going concern value of Pitchford created a double recovery).

On cross-examination, Dr. Kuehn, confronted with the purchase agreement between Howmet and Columbia, which allocated $16,000 of the purchase price for in-tangibles,[22] stated that amount should be subtracted from certain of his estimates, since his projections assumed the Howmet sale involved assets only.[23] Whatever amount was actually received for intangibles must be subtracted from the estimates to avoid an award of damages for an amount that is duplicative in the sense that it has already been recovered.

### Increase in Metal Costs

█ Plaintiff claimed damages for lost profits for the years 1974, 1975 and 1976 but in addition made a specific claim for extra costs attributable to an increase in the amount of aluminum coil used in 1971, 1972 and 1973; plaintiff contended this increase in metal cost was caused by the misrepresentations of defendants concerning the gauge of aluminum Kaiser would continue to use. The Stamco machine plaintiff installed in the spring of 1970 utilized a 2-inch gauge because Kaiser used that gauge; the rest of the industry used a 2⅔-inch gauge. Kaiser, which had used 2 inch, then converted to 2⅔ inches; plaintiff contends that Kaiser concealed its intention to do this to put plaintiff at a competitive disadvantage. This had been presented to the jury during the trial on liability, not as an antitrust violation in itself but as a part of a pattern of conduct from which retaliatory conduct could be inferred. Plaintiff admitted it could not isolate damages for other aspects of its proof on retaliatory conduct but urged that a finding of specific damages for extra use of coil was appropriate. Because plaintiff stated to the jury

**21.** *See, Copper Liquor, Inc., supra,* at 579 n.8: "According to Cook's expert, Wayne Peters, goodwill is the amount that a purchaser would be willing to pay for a business *over and above the value of the business's tangible assets.* Valuing a business's goodwill, of course, is a subjective determination that takes into account factors such as *potential for future profit.*" (emphasis supplied).

**22.** Corporate name and covenant not to compete.

**23.** N.T. 4149 (Kuehn):
"According to the figure I just saw, the purchase price of the tangible assets apparently would be $564,000 and consequently, if I un-derstand it correctly, $16,000 should probably be subtracted from the various estimates presented here on the bottom lines for both the capitalization at 15% and the capitalization at 20%."

However, Dr. Kuehn also indicated that the two items on the intangibles line of the purchase agreement actually had no worth. *See,* N.T. 4146 (corporate name); N.T. 4147 (covenant not to compete). (For the other inadequacies of Dr. Kuehn's testimony, see N.T. 4018–4019, 4050–4051, 4089, 4092–4093, 4108–4109, 4111.)

that damages would be claimed only for 1974, 1975 and 1976, the court was in error in allowing the extra cost of metal for prior years to go to the jury as a separate item of damages; that plaintiff was able to isolate it as a matter of proof (N.T. 3981–3995) is not a sufficient reason to allow it as an item of damages in the context of the trial as a whole. Therefore, the award of $57,000 ($171,000 trebled) is set aside and the defendants' motion for judgment notwithstanding the verdict is granted as to that amount.

### Sufficiency of the Evidence as to Amount of Damages

■ We recognize that once the fact of injury has been proven, the burden on the antitrust plaintiff to establish the "precise amount of damages is not as great as in other kinds of lawsuits." 15 Antitrust Laws and Trade Regulation § 115.01[2] at 115–5 (1978). *See, J. Truett Payne Co. Inc. v. Chrysler Motors Corporation,* —— U.S. ——, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981); *Copper Liquor Inc. v. Adolph Coors Co.,* 624 F.2d 575 (5th Cir. 1980) (less rigid standard of proof with respect to amount of damages caused by an antitrust violation); *Hobart Brothers Co. v. Malcolm T. Gilliland Inc.,* 471 F.2d 894, 902 (5th Cir. 1973), *cert. denied,* 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150 (1973) ("[i]n an anti-trust case the burden on the plaintiff to prove the amount of damages is less severe than the burden to prove the fact of injury . . . ."); *South-East Coal Company v. Consolidation Coal Company,* 434 F.2d 767, 796 (6th Cir. 1970), *cert. denied,* 402 U.S. 983, 91 S.Ct. 1662, 29 L.Ed.2d 149 (1971), *rehearing denied,* 404 U.S. 877, 92 S.Ct. 28, 30 L.Ed.2d 124 (1971) ("The antitrust cases are legion which reiterate the proposition that, if the fact of damages is proven, the actual computation of damages may suffer from minor imperfections . . . ."). However, a plaintiff must offer proof as to the extent of injury, showing that the damage involved is measurable in dollars. *See, Deaktor v. Fox Grocery Company,* 475 F.2d 1112 (3d Cir. 1973), *cert. denied,* 414 U.S. 867, 94 S.Ct. 65, 38 L.Ed.2d 86 (1973). Further,

courts have stated repeatedly that the measure of damages may not be based upon mere guesswork, speculation, or conjecture. *E. g., Bigelow v. RKO Radio Pictures, Inc., supra; Story Parchment Co. v. Paterson Parchment Paper Co., supra; Delaware Valley Marine Supply Co. v. American Tobacco Co.,* 184 F.Supp. 440 (E.D.Pa.1960), *aff'd,* 297 F.2d 199 (3d Cir. 1961), *cert. denied,* 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962).

Although plaintiff did show economic injury in consequence of defendants' conduct, the evidence presented by Columbia as to the actual dollar amount of damages suffered was so deficient as to require a new trial on damages only. The evidence presented by Columbia's two damages witnesses, Bonjorno and plaintiff's expert witness on damages, Dr. Alfred Kuehn, was incomplete, confusing and generally lacking in probative value. The factual basis of the projections, predictions and calculations presented by them was never clear from the testimony.

Plaintiff estimated damages sustained in lost profits and in the decline in value of the business as a going concern by using four projection Methods (Methods C, D, E, and F). Method C (P–3012), projected Columbia's sales based upon government figures on new housing starts and new highway construction during the damages period. Method D (P–3013) projected Columbia's sales by utilizing defendant Kaiser's nationwide sales, while Method E (P–3014) used Kaiser sales from the New Castle, Delaware plant only. Method F (P–3011) relied upon Joseph Bonjorno's estimates of Columbia's potential sales and profits were it not for defendants' wrongdoing.

■ The testimony of an antitrust plaintiff who is an owner or officer of the damaged business may be sufficient to support a jury verdict on damages where the owner is qualified by experience and position to make damages estimates. *See, generally, Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, 122, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969) (Zenith's officers, experi-

enced businessmen, testified that repressive effects on Zenith were due to patent pool; no basis in record for refusing to accept testimony of the two officers as probative evidence); *Greyhound Computer v. International Business Machines*, 559 F.2d 488, 507 n.41 (9th Cir. 1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978) (most of the damages testimony came from Greyhound's president; where the record reflects his competency and the factual basis for his conclusions, an interested witness may testify as to the amount of damage and it is for the jury to determine the weight to be accorded his testimony); *Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690 (5th Cir. 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976) (wholesale distributor's estimation of goodwill value of his business admissible in antitrust suit as an owner is competent to give his opinion on the value of his property; weight and credibility given owner's testimony is generally for the jury); *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 394 (9th Cir. 1957), *cert. denied*, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957) ("We do not hold or imply that a jury verdict could not be upheld under any circumstances solely on the testimony of the plaintiffs. We hold only that if they are qualified to make these estimates, the record must show their competency and the factual basis upon which they rest their conclusions . . . .").

But an inexperienced owner using purely speculative bases for his estimations of damage may provide testimony of such minimal probative force as to warrant a judge's refusal to submit the issue to the jury. *See, Delaware Valley Marine Supply Co. v. American Tobacco Co.*, 184 F.Supp. 440 (E.D.Pa.1960), *aff'd*, 297 F.2d 199 (3d Cir. 1961), *cert. denied*, 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962). It follows that such testimony would justify the grant of a new trial in the exercise of the court's discretion.

We do not find that Mr. Bonjorno was an inexperienced owner who was not qualified to make damage estimates. Bonjorno started Columbia in 1959 and performed proprietary, managerial and sales functions from Columbia's beginning until its assets were sold in 1977. However, we do find the record insufficient in establishing the requisite factual basis for Bonjorno's estimates so that the jury could make a rational determination as to their accuracy.

For example, Bonjorno estimated Columbia's return on sales at 17.6% for 1974, 12% for 1976 and 8% for 1977, all significantly higher than that of any previous year of Columbia's operation; the previous high was only 5.8%. Bonjorno's explanation for this increase demonstrates the minimal evidence upon which this five million dollar verdict rests:

N.T. pp. 3959–3960:

"Q. What was the reason why you projected so much greater profitability in 1974 than you had experienced in your entire history?

A. A number of reasons, Mr. McElroy.

Number one, we would have had a much lower metal cost due to the new configuration. The fact that we were making standard corrugated pipe meant that the material costs would be down by approximately 4 to 5%.

Q. All right.

A. We now were in a position to offer perforated pipe made on our own perforating mill, which would have been a highly profitable product, also, and would have given us an access to other markets.

It would have also given us a much higher percentage of profit in those areas that were remote to southern New Jersey, because the prices were better in areas away from southern New Jersey than they were in the southern New Jersey area, so that we felt we would have a substantially greater margin of profit on the sales that we projected.

Q. So that you would have increased your profitability from 2.6% to 17.6% in one year? That's an increase of 15%.

A. I thought that was reasonable."

N.T. pp. 3958–3959:

"Q. You've projected, in 1974, $1,805,569 in sales and you have an income of $318,683.

Do you know what that percentage is?

A. It looks like its around 15%. I'm not sure without calculating it.

Q. It is 17.6%. 17.6%.

Now, on Exhibit 3062 is there any year in which return on sales exceeded 10%?

A. No, there is not.

Q. Is there any year in which it exceeded 5%?

A. No, there is not.

Q. Isn't there one? 1971?

A. 5.8, I'm sorry.

Q. 5.8% and that was the best year, 5.8%?

A. Yes.

Q. And yet, you projected an income of 17.6% here?

A. Yes."

Also troubling was Bonjorno's estimate as to the pounds of metal sold in 1973 by Columbia, a critical figure since 1973 was the base year selected by the plaintiff as his starting point for all other damage calculations and projections. Although Bonjorno did state a figure before the jury (N.T. 3932: "[a]pproximately, I think they are about 2.3 or 2.4 million pounds, approximately."), the basis in fact or source of the figure was never explained. (N.T. 3932–3942). For example, at N.T. 3933,

"Q. And did you make a compilation for this trial so you could present it to the Court and jury of what the number of pounds were of metal that Columbia sold in 1973?

A. No.

Q. Didn't counsel or anybody—wasn't anybody assigned to go through the records to find out exactly what the total number of pounds was?

A. It's possible, but I didn't do it.

Q. And you are unaware of anybody else doing it?

A. It's possible that counsel may have done it. I am sorry, maybe I misunderstood your question.

Q. My question was, do you know whether anybody did it or not?

A. I don't know specifically.

That the jury was unpersuaded by the Bonjorno testimony is plain from its damage verdict on lost profits which virtually cuts the Bonjorno estimate in half. The Bonjorno testimony of his hopes and aspirations fails to provide evidence of facts from which the jury's calculation may be logically and legally inferred.

There are similar problems regarding the damages testimony of the expert, Dr. Kuehn. Again, the problem of the pound figure for 1973 without a source appears.

"Q. Why did you convert it back to pounds?

A. Only to provide a base number for the subsequent calculation of other ratios.

Q. But the number of pounds doesn't represent what Columbia actually sold in 1973, does it?

A. I—

Q. That you calculated.

A. Since I am not sure that anyone knows precisely what the pounds are, it probably doesn't represent accurately, but it's the calculation that was obtained this way and which Mr. Bonjorno considered a fairly accurate estimate of what the actual figure was during that period.

Q. Did you review any of Columbia's books and records to determine whether or not your estimate of the number of pounds sold by Columbia for fiscal year ending May 1, 1973, was accurate or not?

A. I reviewed some records, but to the best of my knowledge—I am not sure whether one can determine precisely whether it's accurate or not. *I certainly didn't establish that it's accurate.*" (N.T. 4092–4093) emphasis supplied).

The confusion with regard to that particular figure was merely symptomatic of the general confusion and ill-preparedness of the witness, which was admitted by plaintiff's attorney in his closing argument to the jury:

> Dr. Kuehn I think was poorly prepared to defend that basic computation that he gave you. It took him too long and he should have been better prepared. (N.T. 4197).

While recognizing the importance of expert testimony in antitrust proof of damages, 16 A.L.R.Fed. 14, 22 (1973),[24] and the fact that Dr. Kuehn qualified as one competent to offer an opinion in such matters, we determine that the illusion of complete accuracy created by graphs, charts, and garbled expert testimony created a speculative verdict in this case. *See, Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906, 912 (2d Cir.), *cert. denied*, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962) ("The leap required to derive any rational conclusion from the expert's data was too great to allow a jury to take.").

Of the methods for calculating plaintiff's damages, we have already considered Method F that relied upon the estimates of Joseph Bonjorno. Method C, that projected Columbia's sales based upon government figures on new housing starts and new highway construction, was completely repudiated by the testimony of plaintiff's expert. Dr. Kuehn could not explain the relevance, if any existed, of these figures to Columbia's business or to its losses:

> "Q. And the Federal Government publishes statistics on new highway construction?
>
> A. Data are published on both, yes.
>
> Q. On both what?
>
> A. Highway construction and housing.
>
> Q. Now, the highway construction, that's new highways, isn't it?
>
> A. That's correct.
>
> Q. That does not include reconstruction, maintenance or repair, does it?
>
> A. That's correct.
>
> Q. And the housing starts are new housing starts?
>
> A. It's based on new housing, yes.
>
> Q. That would not include reconstruction or repair of existing storm sewers, for example?
>
> A. That's correct.
>
> Q. Now, do you know what percentage of Columbia's business was in new highway construction?
>
> A. *I believe very little.*
>
> Q. Most of it was, in fact, in reconstruction and maintenance, wasn't it?
>
> A. That's my understanding.
>
> Q. Do you know whether there is any relationship between new highways and the use of culverts?
>
> A. Well, new highways and aluminum culvert?
>
> Q. Any culvert?
>
> A. *I would assume there is some.*
>
> Q. You assumed it?
>
> A. *Yes, because at least most highways I see, you know, there tends to be some culverts.*
>
> Q. And that's what you based your estimation of damages on, your assumptions, that when you go along the highway you see some culverts along the road?
>
> A. I used this method as the first of four methods since certain data were here I certainly didn't think it was perfect.
>
> *I thought it might be related,* but that is precisely why in my explanation of which of the various methods I preferred *I listed this as probably the poorest of the four methods.*
>
> *I don't consider this necessarily a very good index.*" (N.T. 4050–4051) (emphasis supplied).

The remaining two methods, utilizing Kaiser nationwide sales (Method D) and Kaiser New Castle sales (Method E), were never

---

24. "Measure and Elements of Damages Under 15 USCS § 15 Entitling Person Injured in His Business or Property by Reason of Anything Forbidden in Federal Antitrust Laws to Recover Treble Damages."

adequately explained to the jury. (N.T. 4018–4019).

■ Although the "yardstick" measure of an antitrust claimant's lost profits, under which the claimant recovers the difference between his net profits during the damage period and the net profits earned in a comparable business unaffected by antitrust violations, is a valid method of estimating damages, 16 A.L.R.Fed. 14, 45 (1973), in this instance the evidence presented was insufficient to establish that the entities used were truly comparable or that the estimates were adjusted to reflect the differences between the businesses compared. *See, Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *William Goldman Theatres, Inc. v. Loew's, Inc.*, 69 F.Supp. 103, *affirmed*, 164 F.2d 1021 (3d Cir. 1946).

Lapses of this nature are frequent in Dr. Kuehn's testimony. Kuehn never could explain how the comparisons in Methods D and E were made in view of the fact that Columbia operated on a fiscal year and Kaiser operated on a calendar year. (N.T. 4057–4068). Kuehn maintained that the calendar year/fiscal year problem would make little difference, however he admitted that he had never calculated it to so determine. (N.T. 4089). Kuehn relied upon the 17.5% normal mark-up of former Columbia salesman, Robert Kennedy, in order to calculate Kaiser's average selling price per pound; however, this figure was not of record in the testimony on damages or liability. Kuehn had difficulty explaining why his calculation of damages for cost of goods sold included a variable cost equal to 11.17% of sales. (N.T. 4108–4109), why an interest expense factor of 7.5% was utilized, and how such interest rate was calculated. (N.T. 4111).

Although Dr. Kuehn's confusion is apparent from a reading of the transcript (N.T. 4003–4150), a reading does not make plain the great difficulty this witness had in responding to questions. On numerous occasions, Dr. Kuehn was unable to answer an inquiry without referring to documents, was unable to find the appropriate figure within the relevant document, and when a figure was located unable to state how it was calculated or why it was used. All of this shuffling of paper and accompanying long silences occurred before the jury. At one point it was necessary to call a luncheon recess in order to give Dr. Kuehn sufficient time to answer a question posed upon cross-examination. The total effect was that of a witness who did not know what he was talking about; therefore, the jury could only rely upon charts and figures, the factual basis for which had not been adequately established or explained.

■ We also recognize that a flexible standard of proof applies where the defendant's wrong doing, here the destruction of plaintiff's business, has made it impossible, as a practical matter, for the plaintiff to produce a more precise figure, *see, Bigelow, supra* 327 U.S. at 262–266, 66 S.Ct. at 578–80, but in this case the brief trial on damages seemed almost an afterthought following the extended trial on liability. Plaintiff's action was originally instituted in 1974. The delay occasioned by the directed verdict for defendants at the end of the plaintiff's case at the first trial and the subsequent appeal prior to the instant trial on remand may be responsible for some of the deficiency in proof. It seemed obvious to the court that plaintiff's expert, a well-qualified and experienced witness, must have understood the basis for his conclusions when they were initially stated. However, on the witness stand as of the date of this trial, Dr. Kuehn was unable to explain, at least in an unconfused manner, the derivation of his figures or their basis in fact notwithstanding the time provided to him by the court for this purpose. Whatever the reasons for this inability, the trial court is convinced that the jury verdict could only be a product of confusion and speculation.

■ Mindful of the delay that has occurred since the limited remand, and the economic loss occasioned to plaintiff thereby in the erosion of the money judgment due to the difference between legal interest and the market rate, we are reluctant to

incur even further delay and have considered whether the delay itself is a reason not to disturb the verdict of the jury. We also gave serious consideration to ordering a remittitur, an action within the trial court's discretion where a jury awards an amount the court deems excessive. 15 Antitrust Laws and Trade Regulation § 115.-03[2] at p. 115–70 (1978); however, no reasoned basis could be found for setting an appropriate figure. The deficiency in plaintiff's proof of damages convinces the court that the verdict as to damages should not stand.

■■■ Where there is no substantial indication that liability and damage issues are inextricably interwoven or that the jury verdict was the result of compromise of liability and damage questions, a second trial on the damages alone is proper. *See, Wagner v. Reading Co.,* 428 F.2d 289 (3d Cir. 1970); *Darbrow v. McDade,* 255 F.2d 610 (3d Cir. 1958); 11 Wright and Miller,

Federal Practice and Procedure § 2814 (1973). In this bifurcated trial, it is clear there was no compromise of liability and damage questions. The separateness of the trials is also substantial indication that liability and damage issues are not inextricably interwoven. The court has also considered whether hearing the evidence on liability is necessary to persuade the jury to award damages in an adequate amount and is convinced that the case on liability can be stated to the jury with the facts and inferences most favorable to plaintiff, consistent with the verdict in its favor. Both the plaintiff and defendants will benefit from this opportunity to present damage testimony to the jury in a clear and unconfusing fashion. In any event, fairness to the defendant requires no less.

For the above reasons a new trial as to damages only is granted. An appropriate Order accompanies this Memorandum.

## APPENDIX A

### IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COLUMBIA METAL CULVERT CO., INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KAISER ALUMINUM & CHEMICAL CORP. and KAISER ALUMINUM & CHEMICAL SALES, INC. | : : | NO. 74–122 |

#### INTERROGATORIES TO BE ANSWERED BY THE JURY

1. (a) Do you find from the evidence that there was a conspiracy between Kaiser Aluminum & Chemical Corp. and Kaiser Aluminum & Chemical Sales, Inc. in unreasonable restraint of trade?     Yes_X_ No____

   (b) If your answer to 1(a) is yes, was the conspiracy in unreasonable restraint of trade a material and proximate cause of any injury to the business and property of plaintiff?     Yes_X_ No____

2. (a) Do you find from the evidence that the relevant product market was:     [CHECK ONE ONLY]

   (i) aluminum culvert and drainage pipe?     ___X___

   (ii) metal culvert and drainage pipe, including pipe made of steel and aluminum?     _____

   (iii) culvert and drainage pipe, including pipe made of steel, aluminum and concrete?     _____

   (b) If you find the relevant product market was (ii) metal culvert and drainage pipe, including pipe made

of steel and aluminum, or (iii) culvert and drainage pipe, including pipe made of steel, aluminum and concrete, you should not answer questions 3 or 4; you have concluded your deliberations.

3. If you find in answer to Interrogatory 2 that the relevant product market was (i) aluminum culvert and drainage pipe, do you find from the evidence:

   (a) that Kaiser Aluminum & Chemical Corp. or Kaiser Aluminum & Chemical Sales, Inc. monopolized the aluminum culvert and drainage pipe market in that it had the power to control prices or exclude competition in the relevant geographic area which was willfully acquired or willfully maintained? or    Yes ✓   No___

   (b) that Kaiser Aluminum & Chemical Corp. or Kaiser Aluminum & Chemical Sales, Inc. conspired with regard to aluminum culvert and drainage pipe to control prices or to exclude competitors in the relevant geographic market? or    Yes ✓   No___

   (c) that Kaiser Aluminum & Chemical Corp. or Kaiser Aluminum & Chemical Sales, Inc. attempted to monopolize the aluminum culvert and drainage pipe market with the specific intent to obtain power to control prices or to exclude competitors and committed an act in furtherance of monopolization which had a dangerous probability of achieving monopolization?    Yes ✓   No___

4. If your answer to 3(a), (b), or (c) was yes, was any such defendants' monopoly, conspiracy to monopolize, or attempt to monopolize as found by you a material and proximate cause of any injury to the business or property of plaintiff?    Yes ✓   No___

   You have now completed your deliberations.

   The Foreperson will place his/her signature on the signature line below and add the date, and the jury will return to the Courtroom.

   /s/ Flora Eikenkoetter
   _____
   Foreperson

Date:   8/16/79

## APPENDIX B

### IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COLUMBIA METAL CULVERT CO., INC.       :        CIVIL ACTION
                                       :
                    v.                 :
                                       :
KAISER ALUMINUM & CHEMICAL CORP.       :
and KAISER ALUMINUM & CHEMICAL         :
SALES, INC.                            :        NO.   74–122

### INTERROGATORIES TO BE ANSWERED BY THE JURY

1. In what amount, measured in dollars and cents, do you find from the evidence that Defendants caused damage to Plaintiff by reason of an increase in the usage of aluminum coil in 1971, 1972 and 1973?

State such amount; or "None" in the following blank according to your finding. $57,000

2. In what amount, measured in dollars and cents, do you find from the evidence that Defendants caused damage to Plaintiff by profits lost for the years from June 1, 1973 through May 31, 1977?

State such amount; or "None" in the following blank according to your finding. $1,048,000

3. In what amount, measured in dollars and cents, do you find from the evidence that Defendants caused damage to Plaintiff by reduction in the value of Columbia as a going concern as of May 1, 1977?

State such amount; or "None" in the following blank according to your finding. $710,000

Flora Eiherenkoetter
Foreperson

Date: 8/21/79
5:30 p. m.

KINDLY ADVISE THE MARSHAL WHEN YOU HAVE
COMPLETED DELIBERATIONS.