Joseph A. BONJORNO, George M. Kerr, Jr. and Barbara K. Clisby, as Transferrees in Liquidation and Dissolution of Columbia Metal Culvert Co., Inc.

v.

KAISER ALUMINUM & CHEMICAL CORP. and Kaiser Aluminum & Chemical Sales, Inc.

Civ. A. No. 74–122.

United States District Court, E.D. Pennsylvania.

Jan. 17, 1983.

Michael M. Baylson, Richard L. Thurston, Eric H. Auerbach, Gerard P. Shotzbarger, Duane, Morris & Heckscher, Philadelphia, Pa., for plaintiffs.

Richard P. McElroy, Alexander D. Bono, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for defendants.

## MEMORANDUM and ORDER

SHAPIRO, District Judge.

### INTRODUCTION

Before the court are post-trial motions arising out of a retrial on damages only in this antitrust litigation. Following the entry of judgment for plaintiffs on the jury's answers to four special interrogatories in the trebled amount of $9,567,939, defendants Kaiser Aluminum & Chemical Corp. ("KACC") and Kaiser Aluminum & Chemical Sales, Inc. ("KACSI") moved for a judgment notwithstanding the verdict or, in the alternative, for a new trial on both liability and damages.

Plaintiff Columbia Metal Culvert Co., Inc. ("Columbia"), a liquidated corporation (interest in this litigation has been assigned to the present plaintiffs, its former shareholders), originally brought an action against KACC and KACSI, former Columbia salesman Robert A. Kennedy and his company, Kennedy Culvert and Supply, in which it alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14. A detailed description of the specific actions complained of and the procedural

history of this case is contained in the Memorandum accompanying the Order of June 17, 1981 published at 518 F.Supp. 102 (E.D. Pa.1981).

At the first trial before The Hon. Edward N. Cahn, judgment in favor of defendants was entered on defendants' motion for a directed verdict at the close of Columbia's evidence on the grounds that Columbia, formerly a manufacturer and distributor of aluminum culvert pipe, had not established a *prima facie* case of conspiracy in restraint of trade between KACC and KACSI or between either and Kennedy, proved that Kaiser had monopoly power in the relevant product market, or established a *prima facie* violation of Section 3 of the Clayton Act. The Third Circuit affirmed the grant of a directed verdict as to Kennedy but reversed as to KACC and KACSI, except on the Clayton Act count. Sufficient evidence was presented to allow a jury to decide the relevant product market, whether KACC/KACSI had monopolized or attempted to monopolize that market, and whether KACC and KACSI conspired in violation of Sections 1 and 2 of the Sherman Act.

On remand and transfer to the docket of this court, there was a bifurcated trial by jury. The jury found on answers to special interrogatories that the relevant product market was aluminum culvert and drainage pipe, that KACC and KACSI had monopolized and attempted to monopolize the relevant product market, that KACC and KACSI had conspired in violation of Sections 1 and 2 of the Sherman Act, and that Columbia had been injured by the unlawful acts of KACC and KACSI. Damages awarded in the amount of $1,815,000 were trebled and judgment entered in favor of plaintiffs for $5,445,000. Following a direct appeal (because defendants' post-trial motions were untimely filed), the case was remanded to this court by the Court of Appeals for disposition of Kaiser's motions for a judgment notwithstanding the verdict or in the alternative for a new trial.

We denied Kaiser's motions for judgment notwithstanding the verdict or a new trial as to liability because the evidence at retrial was not substantially different from that previously held adequate by the Court of Appeals; the jury's determination was not so against the weight of the evidence as to shock the conscience of the court. 518 F.Supp. at 102. However, judgment notwithstanding the verdict was granted as to the first interrogatory on damages (awarding defendants $57,000 for Columbia's increased usage of aluminum coil in 1971–73). *Id.* at 114. A new trial was granted on the second and third interrogatories, awarding $1,048,000 in lost profits from 1973 to May 31, 1977 and $710,000 for loss of going concern value thereafter.

Plaintiffs had presented only two damages witnesses, plaintiff Bonjorno himself and an expert, Dr. Alfred Kuehn. The record was found insufficient to establish the requisite factual basis to allow the jury to make a rational determination of the accuracy of Bonjorno's testimony. *Id.* at 115. Dr. Kuehn's testimony was found confused and confusing. "The total effect is that of a witness who did not know what he was talking about; therefore, the jury could only rely upon charts and figures, the factual basis for which had not been adequately established or explained." *Id.* at 118. In sum, plaintiffs' evidence created a speculative verdict on damages. *Id.* at 117. Because the damages and liability issues were not inextricably interwoven, and there was no indication that the jury verdict was the result of compromise on the liability and damage questions, retrial on damages only was ordered. *Id.* at 119.

The parties were requested to state their positions on procedure for a fair retrial on damages. Defendants had conceded at the argument on post-trial motions following the first trial that the court had the power to retry on damages only, but after the new trial on damages was granted, defendants argued that it would violate their constitutional right to trial by jury. However, counsel for defendants actively participated in discussions on the damage trial procedure.

At the outset of the damage trial, the court informed the jury of their duties.

Because a jury in an antitrust matter must award only those damages that flow from the antitrust injury, see, 518 F.Supp. at 109, the opening statement was designed to acquaint the jurors with the nature of the antitrust violations that had been found. The jurors were told the parties, the businesses they were or are engaged in, the product and geographic markets involved, the antitrust laws the prior jury had found violated, the purpose of those laws, and the types of liability evidence presented at the prior trial. Finally, the liability interrogatories and answers of the prior jury (518 F.Supp. at 119, App. A) were read to the damage jury. (N.T. 20–25).

Upon the conclusion of this opening statement, counsel for plaintiffs made opening remarks not only on the evidence to be presented by plaintiffs during the retrial but also the liability evidence that had been presented during the prior trial. To provide the jury with an understanding of the activities that gave rise to liability, plaintiffs' counsel was permitted to list the types of activities by KACC and KACSI relied on by plaintiff to establish liability at the first trial: that defendants refused to sell raw materials to Columbia; located a new culvert manufacturing plant within forty miles of Columbia's plant to retaliate against Columbia for buying materials from another supplier; set up Kennedy, the former Columbia salesman, to compete with Columbia; instituted a "price squeeze," in which Kaiser raised the price of the aluminum needed to fabricate culvert but sold fabricated culvert at a constant price; and induced Columbia to buy a machine suitable for use only with Kaiser products unless modified at significant expense. (N.T. 32–41). Counsel for defendants responded to plaintiffs' statement on liability in his opening remarks. (N.T. 53–56).

The jury, answering four special interrogatories on damages (attached hereto as Appendix A), awarded plaintiffs $728,000 for actual losses, $742,520 for lost profits on the sale of aluminum culvert pipe, $80,000 for lost profits on the sale of flat corrugated aluminum sheet, and $1,638,793 for the diminution in the value of the business. Judg-

ment in the trebled amount of $9,567,939 was entered on this special verdict. Kaiser defendants have again filed post-trial motions. Judgment notwithstanding the verdict is sought on the grounds that: the retrial on damages was improper because the jury was unable to award damages flowing only from the antitrust injury; damages awarded for lost profits duplicated damages for actual losses (Int. 2); the profit projections were unsupported by evidence and artificially enhanced by plaintiffs' use of an improper geographic area and understatement of certain expenses; and the plaintiffs' contentions in the trial on damages contradicted their contentions on the price squeeze in the trial on liability. Defendants also contest the period for which an award of damages on actual losses and lost profits was permitted. Defendants claim that damages awarded for lost profits from the intended sale of flat corrugated sheet (Int. 3) were speculative. Defendants claim also that allowing damages for loss of the value of a going concern (Int. 4) was improper because Columbia did not prove it ever actually terminated business during the damage period. Defendants contend that in any event the damage for loss of going concern value was overstated and was based on assumptions not supported by the evidence.

Defendants move in the alternative for a new trial on the grounds that the retrial on damages only was improper and prejudicial; the conduct of plaintiff's counsel was inflammatory; the court erred in its evidentiary rulings, charge and form of special verdict; and finally that the amount of the verdict was grossly excessive, shocking to the conscience, and the product of jury bias against defendants. Defendants' alternative motion for a new trial on damages only is denied. Defendants' motion for judgment notwithstanding the verdict is denied with regard to damages awarded in response to Interrogatories 1, 2 and 3 and granted as to damages awarded in response to Interrogatory 4. As a result, the jury's award is reduced by $1,638,793 (Int. 4) and the award remaining is in the total amount

of $1,550,520. Therefore, when trebled, plaintiffs are entitled to entry of judgment in the amount of $4,651,560.

## RETRIAL ON DAMAGES ONLY

KACC and KACSI (hereinafter referred to collectively as "Kaiser") object to the retrial on damages only ordered by the court on June 13, 1981 upon granting in part its motion for new trial. Kaiser contends that because it did not hear the evidence on liability, the damage jury was unable to determine which, if any, of the losses that Columbia suffered were actually caused by the antitrust violation. That such causation was required is clear. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) ("Plaintiffs must prove *antitrust* injury, which is to say injury of the type . . . that flows from that which makes defendants' acts unlawful. . . ."). However, the retrial procedure utilized did not in and of itself preclude rational jury determination of damages caused by the antitrust violations found by the previous jury.[1]

The Third Circuit has expressly approved the use of a retrial on antitrust damages in *Pitchford v. PEPI, Inc.,* 531 F.2d 92 (3d Cir.1975), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976); other cases in the Third Circuit are collected in plaintiffs' brief at Appendix C.[2] In that case the Court of Appeals found legal error in plaintiff's calculations of damages and remanded to the district court for a new trial on damages only. 531 F.2d at 107–09. We cannot presume that the Court of Appeals ordered a procedure that was *per se* viola-

tive of the rights of antitrust defendants. *Pueblo, supra* was decided after *Pitchford, supra,* but it was not the first case to hold that damages must be caused by defendant's antitrust violations and it may be assumed that the Court of Appeals was cognizant of a causation requirement when *Pitchford* was decided. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), for example, decided years before the remand for a damage trial in *Pitchford,* referred explicitly to the "necessary causal relation between the [violator's] conduct and the claimed damages . . . ." *Zenith, supra* 395 U.S. at 125, 89 S.Ct. at 1577.

Defendants never requested that special interrogatories as to the alleged anticompetitive acts complained of by plaintiffs be submitted to the liability jury. (Defendants' Brief at 14–15, 23–24). Kaiser claims that the damage jury could not know which of the five alleged anticompetitive practices complained of by plaintiffs were actually relied upon by the jury that found it liable. But plaintiffs' economist did not attempt to and did not have to distinguish between actual losses caused by the various types of anticompetitive practices. Whether plaintiffs' losses were caused by one or more of the anticompetitive acts was immaterial on the damages issue so long as the jury was presented with competent evidence to prove the extent of plaintiffs' losses caused by Kaiser's impairment of the free and open market in aluminum culvert pipe. Plaintiffs' evidence was so directed. (*See, e.g.,* N.T. 509, 542, 548, 596). The charge to the jury made clear that the jury could only award damages for injury caused by Kaiser's conduct in the market:

1. In his opening statement, Kaiser's counsel "assured" the jury that Kaiser did not violate the antitrust laws or "any other law" notwithstanding the prior jury's determination of liability. (N.T. 52). Kaiser continues to object to the prior jury's determination of liability. Indeed, Kaiser seemed to protest the very mention of the previous liability verdict to the damage jury. (Defendants' Brief at 22). Of course, informing the damage jury of the prior determination of liability was a necessary first step in a retrial on damages to ensure that the damages, if any were found, flow from the antitrust vio-

lations. The court made strenuous, although not altogether successful, efforts to limit reference to the issues resolved at the liability phase to the bare minimum required for the jury to understand and determine the damage issues. (Defendants' Brief, 18–60; Plaintiffs' Brief, 26–54).

2. It has only recently been reported that the Court of Appeals for the Seventh Circuit has awarded a new trial on damages only in the MCI–AT & T antitrust litigation. *Philadelphia Inquirer,* January 13, 1983.

You are not to presume just because Columbia suffered financial losses or went out of business that all such losses are caused by Kaiser. The plaintiff, as I said, must prove those financial losses are setbacks that were caused by Kaiser and establish some reasonable basis in the evidence for the damages that you find.

Similarly it follows from that that you should not award plaintiffs damages for losses caused not by Kaiser but by conditions in the economy in general or a recession in the construction industry, aluminum shortage, a lack of price protection for long-term requirement contracts.

You may also consider whether or not plaintiffs' calculations should have taken into account poor business judgment or poor management. Some corporations suffer losses solely because of their own inadequate financial capitalization. You can't award plaintiffs damages for all its losses if you find that Columbia was under capitalized, that is that there was a lack of sufficient working capital and that losses were suffered as a result of that, because under such circumstances Columbia's financial inadequacies rather than Kaiser's conduct would have caused some portion of the losses.

(N.T. 1531–32).

■ Even if there were a serious question raised as to the propriety of a new trial on damages only, defendants waived objection to this procedure. Before issuing the June 17, 1981 Order granting the retrial, defendants spoke in favor of the concept. Addressing the court's question during supplemental oral argument on the post-trial motions on December 29, 1980, counsel for Kaiser stated:

... With respect to the grant of a new trial with respect to damages alone, obviously, in our submission, the cases would support that kind of remedy.

As to the mechanics upon the new trial, it seems to me, Your Honor, that there would, of necessity, simply be more to the trial than a review of the charts, testimony of Dr. Kuehn, or whomever the plaintiff wished to put on as a fact witness or expert witness. It seems to me there are additional matters relevant to damages and the amount of damages which also go to questions of causation. Those, as we have addressed in our post-trial briefs, deal with conditions in the marketplace that may have impacted upon Columbia's volume of sales, and hence on the amount of profit that it would have earned even assuming the existence of violations of the antitrust laws by Kaiser which also impacted upon Columbia....

With respect to liability, I believe that it would be sufficient to inform the jury that a verdict on liability has been established; that a jury has found that that violation of the antitrust laws caused some damage to Columbia, and it would be up to the jury to determine what the extent and amount of that damage was, and I believe that a trial could occur.

Docket Entry No. 510, N.T. 406. Defendants, having supported a new trial on damages before the jury's award at such trial was known, should not be permitted to object to the procedure itself just because its outcome is not to their liking.

■ But even if defendants are correct that a limited retrial on the issue of the amount of damages was so prejudicial to Kaiser as to constitute reversible error, the remedy can certainly not be a judgment notwithstanding the verdict in favor of defendants; at most defendants are entitled to a retrial on both liability and damages. That remedy does not lie with this court at this time. Following a bifurcated trial on liability and damages on remand from the Court of Appeals, this court denied a motion for a judgment notwithstanding the verdict on liability; judgment notwithstanding the verdict was granted as to one item of damages in the amount of $157,000 and a new trial granted as to the award of damages for lost profits ($1,048,000) and destruction of Columbia as a going concern ($710,000). But, that new trial was as to damages only for the reasons stated in the court's Opinion of June 18, 1981. At this juncture, the power of this court is limited to granting a new trial again on damages

only. This was called to the attention of counsel frequently in the course of the trial in trying to assure fair procedures and prevent yet another retrial. (N.T. 97–99; 976–978). Therefore, the court concludes that defendants' objections to a limited retrial on damages are only to preserve them for the Court of Appeals which, of course, has the power to order a new trial on liability and/or damages.

## JUDGMENT NOTWITHSTANDING THE VERDICT

 The standard in this Circuit for the entry of judgment notwithstanding the verdict is clear. The court must interpret the evidence in the light most favorable to the verdict winner, and may grant the motion only if that evidence and the reasonable inferences to be drawn therefrom fail to support the verdict as a matter of law. *Neville Chemical Co. v. Union Carbide Corp.,* 422 F.2d 1205, 1210 (3d Cir.), *cert. denied,* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). *See also, Hahn v. Atlantic Richfield Co.,* 625 F.2d 1095, 1098–99 (3d Cir. 1980), *cert. denied,* 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981); *Kademenos v. Equitable Life Assurance Society,* 513 F.2d 1073, 1074 (3d Cir.1975); 6A *Moore's Federal Practice* § 59.08[5] at 59–152 (1979). A directed verdict may be entered on only one or a combination of jury findings if a special verdict has been returned in accordance with Fed.R.Civ.P. 49(a). *See, Franklin Music Co. v. American Broadcasting Cos., Inc., et al,* 616 F.2d 528 (3d Cir.1979); *Fox v. Kane-Miller Corp.,* 398 F.Supp. 609, 649 (D.Md.1975), *aff'd,* 542 F.2d 915 (4th Cir. 1976).

 Defendants concede this standard but contend that the court should enter judgment n.o.v. because the verdict is contrary to the evidence and unsupported in the record; that is, there is but one reasonable conclusion as to the proper judgment. Defendants argue this persuasively and well. Defendants' brief makes an excellent closing speech to the jury; the problem is that the jury heard it and nonetheless decided for plaintiffs. With the exception of

damages for loss of value of a going concern discussed below, there is no error of law during the trial or in the court's charge to the jury on damages (N.T. 554) that would justify setting aside that verdict. The charge was fair and clear although relatively brief because it commented little on the evidence argued in detail by able counsel for both sides. But it touched on and left to the jury all but one of the matters of which defendants now complain in asserting a right to judgment notwithstanding the verdict.

The Supreme Court stated in *Zenith, supra:*

> Trial and appellate courts alike must also observe the practical limits of the burden of proof, which may be demanded of a treble damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.

395 U.S. at 123, 89 S.Ct. at 1576. Accordingly, in an antitrust case, damages need not be proven with exactness or precision; rather, "the wrongdoer shall bear the risk of uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946). The court does not have the prerogative of drawing inferences from facts within the exclusive province of the jury that are contrary to its findings without usurping the functions of the jury as a fact finding body. *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 566, 51 S.Ct. 248, 251, 75 L.Ed. 544 (1931). It was for the jury to determine the weight of the evidence and the credit to be given the witnesses, expert or otherwise; it has given its verdict accordingly. To set this verdict aside except for clear error of law would impermissibly intrude on the role of the jury in an antitrust trial.

## DUPLICATION OF ACTUAL LOSSES AND LOST PROFITS

 Kaiser contends that the award for hypothetical lost profits (Int. 2) duplicates

the award for actual losses (Int. 1). Kaiser argues that these two types of losses are "irreconcilably contradictory and mutually exclusive." (Defendants' Brief at 64). *See, William Goldman Theatres, Inc. v. Loew's, Inc.,* 69 F.Supp. 103, 105 (E.D.Pa.1946) *aff'd,* 164 F.2d 1021 (3d Cir.), *cert. denied,* 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948). In *William Goldman Theatres,* the plaintiff was unable to obtain first-run movies for his leased theater because of defendants' conspiracy to restrain trade. 150 F.2d 738, 742 (3d Cir.1945). The district court declined to award out-of-pocket expenses actually incurred by plaintiff in connection with an alternative use of the premises in addition to the lost profits from the hypothetical operation of the business from which plaintiff was excluded by defendant's conduct. 69 F.Supp. at 105. Plaintiff's actual losses from the ineffective effort to mitigate damages were not causally connected with the losses from the intended use for which antitrust damages were awarded. *See,* 69 F.Supp. at 105.

However, Columbia was in business throughout the damage period as a culvert fabricator and distributor. To the extent it would have made profits in a free and open market, the antitrust laws provide compensation. Columbia incurred actual losses while running the business it contended it would have operated profitably but for the illegal conduct of the defendants. Plaintiffs' damages would have been reduced had Columbia actually made a profit during the damages period, and so plaintiffs may recover the net losses that were actually incurred in addition to the profits they would have made. Had Columbia made a profit, that sum would have been subtracted from hypothetical lost profits to arrive at the true measure of harm to Columbia. *Pitchford, supra* at 109. But plaintiffs suffered a loss rather than a profit and are entitled to subtract this negative figure from the hypothetical lost profits proved. (*See,* N.T. 55–56). The resulting calculation, the addition of actual losses to lost profits, is necessary to make plaintiffs whole.

## LOST PROFITS ON ALUMINUM CULVERT PIPE

█ Plaintiffs utilized a market share theory to calculate their hypothetical lost profits during the damage period. Plaintiffs' expert economist, Dr. Gary Bowman, calculated the amount of aluminum culvert pipe actually sold in the relevant market and then calculated the proportion of sales Columbia would have made absent an antitrust violation. He sought to establish the number of pounds of culvert Columbia would have sold in a free and open market and multiplied that number by the estimated revenues Columbia would have received per pound. From this estimate of gross revenues he subtracted his estimate of Columbia's total expenses if there had been a free and open market. This type of analysis is proper in a case in which plaintiffs were deprived from competing freely in a particular product and geographic market, and the injured party need not produce the "kind of concrete, detailed proof of injury which is available in other contexts." *Zenith, supra* 395 U.S. at 116, 123–35, 89 S.Ct. at 1572, 1576–82.

█ An expert opinion on relevant damages issues is not enough to satisfy the plaintiffs' burden on damages unless that opinion is based on relevant data and the assumptions behind the opinion are shown to be realistic so that the jury has a rational basis for its decision. *In re IBM Peripheral EDP Devices Antitrust Litigation,* 481 F.Supp. 965, 1012, 1020 (N.D.Calif.1979). Plaintiffs presented expert testimony on all elements of the market share theory, their estimates of the size of the local market at issue, Columbia's share of the local and non-local markets assuming free and open competition, and Columbia's expenses in a free and open market; therefore, the record did not force the jury to engage in impermissible speculation.

Defendants argue that the jury's award of plaintiffs' claims for lost profits must be set aside because plaintiffs' projection of lost profits on the sale of aluminum culvert pipe is based upon assumptions unsupported and contradicted by the evidence in that:

a. the volume of sales in the so-called "local area" are deliberately overstated, contrary to the evidence in the record;

b. plaintiffs' proof on damages improperly deviated from the stipulated relevant geographic market; and

c. plaintiffs' projections of profits on the sale of aluminum culvert pipe were artificially and improperly enhanced by understating certain expenses.

The first step in estimating what a defunct business would have sold in a free and open market was to estimate the overall volume of the market. Plaintiffs' expert chose to use two geographic markets: local and non-local. The local, or "Vineland," selling market was the area covered by the approximately 150-mile radius surrounding Vineland, New Jersey, the location of Columbia's plant. The non-local market was the remainder of the geographic market for which plaintiffs seek damages. Plaintiffs' stated rationale for using two markets was that Columbia would have commanded a significantly greater proportion of sales in the local rather than non-local area—50% rather than 30%.

Thus, if plaintiffs' estimate of the number of pounds sold in the local market was too high because it took into account pounds that were sold in the non-local market, the figure for the total number of pounds of pipe sold by Columbia would be inflated, since the local poundage is multiplied by .5 but the non-local by .3. It is plaintiffs' burden to put into evidence a reasonable and rational estimate of the size of the market. *Schwabe, Inc. v. United Shoe Machinery Corp.,* 297 F.2d 906, 911–12 (2d Cir.), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962). Where conflicts as to credibility exist as to certain estimates, they are to be resolved by the jury.

Defendant points out that Dr. Bowman used figures for the so-called "local market" that included non-local sales although Dr. Bowman asserted to the contrary. (N.T. 609). Under cross-examination, Dr. Bowman stated that he obtained his estimate of

local market sales by adding sales from Kaiser's New Castle, Delaware plant to Columbia's Vineland sales. This approximately 150-mile local sales area included all of New Jersey, Delaware, most of Maryland, approximately the eastern third of Pennsylvania and very small portions of Virginia, West Virginia, and New York. Ex. D–150 (Map of Eastern United States with 150-mile radius of Vineland delineated). Kaiser introduced uncontradicted deposition testimony that New Castle sales include sales from the entire state of "Virginia, West Virginia, Maryland, Delaware, New Jersey, Pennsylvania." (N.T. 886). Dr. Bowman used an "adjusted territory pounds" figure and then assumed that included only sales within the local area (N.T. 610); Kaiser argues the invalidity of that assumption. Kaiser's evidence tends to establish that significant sales were made outside the local area that Dr. Bowman considered the local market; Dr. Bowman admitted that if such were the case, his figures would have to be adjusted. (N.T. 611). Kaiser argues that because the jury had no basis upon which to adjust Dr. Bowman's inflated figures, Dr. Bowman's opinion on the total pounds of culvert sold by Columbia permitted the jury to speculate as to the total size of the market.

But Dr. Bowman told the jury he divided the entire market into two shares basically for two reasons: Columbia would have made more sales in an area closer to its plant, and Kaiser data from its New Castle and Schenectady plants was available. The local market focused on Kaiser sales areas and was not strictly speaking an area within a 150-mile radius of Vineland, New Jersey as defendants contended. Since Kaiser was the dominant selling force in the total market, Kaiser sold most of the aluminum culvert pipe, and the Kaiser data provided a natural factual basis for the computation of the market. On plaintiffs' proof of its damages from Kaiser's violation of antitrust laws, Kaiser does not have standing to complain about its data not providing a precise "geographical fit" to the relevant geographical market in this case.

Q. Why did you pick those two areas? Why did you make that division?

A. Generally speaking the reason for making any division if you divide an overall market area into subareas you get a somewhat more accurate projection. That is the share of the market Columbia would have had in the near areas is bigger than it would have had in the further away area. The reason I chose those two areas is that that is the way Kaiser's statistics were broken down. It was convenient. They had figures for sales to what they called the New Castle area, and they had sales outside of that that I called sort of loosely the non-local area which also may be called the Schenectady area. Since I couldn't breakdown Kaiser's figures any other way and I had Mr. Bonjorno available to tell me how his sales broke down between the two areas as defined by Kaiser it was convenient to use those two breakdowns rather than a breakdown of the overall market into two submarkets.

Q. Once you had decided to make that breakdown, what was the first thing you then did with the data you had available?

A. Once I had the breakdown I wanted to see what kind of market share each of the companies would have had, specifically what market share Columbia would have had over the period '74 through '77.

Q. Did you attempt to determine what volume had actually been sold in each of those areas?

A. Yes, I did. I described that earlier. I'm sorry, that is clearly the first step. You have to know how much was sold in each of the areas over the period.

(N.T. 305–6; Dr. Bowman).

Plaintiffs contend that, even if their estimate of total pounds sold in the local market was inflated by overstatement of the size of that market, Kaiser could have introduced its own data demonstrating the size of the local market. (Plaintiffs' Brief at 69). Defendants chose instead to attack the credibility of plaintiffs' evidence at trial and its adequacy post trial. But once the jury has determined the credibility issues adversely to defendants only the issue of adequacy remains and the standard of proving damages is liberal. *Bigelow, supra.* That standard has been met if plaintiffs' expert is to be believed.

To determine the number of pounds of aluminum culvert pipe Columbia would have sold absent Kaiser's antitrust violations, Dr. Bowman multiplied the total poundage that would have been sold by all companies by his estimate of Columbia's share of the local and non-local markets. If that estimate had no basis in fact, the resulting calculation had no basis in fact and the jury in considering it would have been speculating in arriving at its verdict on lost profits.

Dr. Bowman determined that in a free and open market Columbia would have almost only Kaiser as a competitor and that Columbia would have obtained 50% of the sales in the local market and 30% of the sales beyond the local market.

Q. Now, why did you select fifty per cent—well, for the three years '75, '76 and '77, why did you use that specific figure [for the local area]?

A. Basically because there were two competitors in the marketplace. Basically was Kaiser and Columbia, and basically they were equally situated.

It is true that Columbia was developing its position, but fundamentally regarded them as equally sitiated competitors, and I think they would have shared the market equally.

(Examination of Dr. Bowman, N.T. 507). The credibility of Dr. Bowman's analysis of the relative strengths of Columbia and Kaiser absent antitrust violations was a question for the jury.

However, Dr. Bowman was obliged to demonstrate that he took other potential competitors into account in concluding that

a fully competitive aluminum culvert market would be a duopoly. Under cross-examination Dr. Bowman asserted that he took such other firms into account but considered their influence negligible.[3]

At the trial Kaiser vigorously attacked Dr. Bowman's assumption that Columbia could have had 50% of the sales in the local area and 30% of the non-local sales. Defendants' witnesses were allowed to testify about possible competitors of Columbia and the entry into the aluminum culvert market of steel culvert producers. Kaiser's expert contested Columbia's alleged share of the market and testified to the fallacies of Dr. Bowman's analyses. Problems in comparing Kaiser's calendar year figures and Columbia's fiscal year figures were also developed at length. Dr. Bowman placed before the jury a market share estimate of his view of Columbia's position in an open market. Since it had some support in the evidence, Dr. Bowman's evaluation of the non-local market and his disregard of competitors was for the jury to consider and evaluate.

After Dr. Bowman estimated how much pipe Columbia would have sold in unrestrained local and non-local markets, he multiplied these figures by the estimated selling price for each pound of pipe to ascertain Columbia's gross revenues. The next and final step in estimating the lost profits was to deduct Columbia's estimated expenses in a market free of Kaiser's antitrust violations.

Defendants contend several aspects of Bowman's projected expenses are unrealistically low. But to the extent Dr. Bowman's estimates were supported by some evidence on the record, we cannot state that the jury had no basis upon which to base its evaluation. Dr. Bowman arrived at a figure for Columbia's hypothetical interest expense that was quite low. The actual rate at which Columbia was able to borrow during the damage period was 3.75% above the prime rate. This money was obtained from

---

**3.** After stating there were two "major" sellers, he was asked about a third company:

Q. So there was a third company. Is it also known as Lane Metal Products? .
A. Yes, I had forgotten—
Q. This is a company that is a subsidiary of Bethlehem Steel?
A. Yes, I understand it is.
Q. So you found a third company, Lane, in the local area, selling aluminum pipe in the local area?
A. Yes, that's correct.

. . . . .

Q. Why didn't you take Lane into account when you were estimating 50 per cent in the local area?
A. Because Lane was only a very small factor in that market, more negligible.
Q. You mean in reality, they were a small factor? You tried to determine how many pounds they sold or something and you determined they didn't sell many pounds?
A. No. They would have been a small factor. I was making projections of what Columbia would have done in free and open competition.
Q. I am talking about Lane, not Columbia.
A. I thought you were asking about Columbia's 50 per cent share of this sub-area, the local area, and that is what I was attempting to respond to.
Q. What I am trying to determine is did you take into account whether Lane would have any market share in this local market?

A. I took that into account, yes. I considered them as a possibility, certainly.
Q. Well, did you try to estimate what share they would have gotten?
A. I—yes.
Q. What did you come up with?
A. My analysis suggests that the share they would have gotten would have been very small, essentially negligible.
Q. Essentially negligible?
A. Yes.
Q. [N]either Lane nor Columbia in the non-local—local area were much of a factor, yet you gave Columbia 50% of business and you gave Lane one or 2%. Why is that?
A. Because of the position that Columbia was in, with the facilities they had, production facilities, the ability to produce, the kind of equipment they had, the marketing strategy, the product line they offered, the expertise, the kind of connections they had in the business. They were doing fairly well in '73. As a matter of fact, they had 38% of that local area in 1973.
Q. Did you make any analysis—similar analysis of Lane Metal Product as a subsidiary of Bethlehem Steel to see if they had the ability to market in this area under your projections?
A. I didn't do a specific detailed study of Lane, no, I did not.

(Cross-examination of Dr. Bowman, N.T. 613, 614–15, 617).

Columbia's sole banking lender, the Philadelphia National Bank. Dr. Bowman found the average prime rate during the damage period to be approximately 8% (N.T. 559). Instead of using the average percentage of 11.75%—prime plus 3.75%—for Columbia's borrowing costs, Dr. Bowman estimated that in a free and open market Columbia's interest rate would have been 9.5%, the 1975 BAA bond rate. (N.T. 559).

Dr. Bowman admitted that companies of Columbia's size "would not generally borrow with bonds; that is, they tend to borrow directly from a bank instead of a bond." (N.T. 559). But there was testimony from the PNB bank officer for the Columbia account, that had Columbia not been injured by Kaiser's anticompetitive acts it would have been able to borrow funds more cheaply (N.T. 1310); the jury was informed that this bank would recover its unpaid loans (in excess of $320,000) from any award to plaintiffs. But the basis for Dr. Bowman's hypothetical interest rate was not "thin air." *In re IBM, supra* at 1019. There is no justification for entering a judgment notwithstanding the verdict on lost profits on the sale of aluminum culvert pipe.

### LOST PROFITS ON CORRUGATED ALUMINUM SHEET

Columbia's business was fabricating culvert pipe. Although it never actually engaged in any other business, plaintiffs contend that Columbia was ready and willing to begin fabricating flat aluminum sheet, the product from which other fabricators make riveted rather than spiral pipe, and would have been able to do so but for Kaiser's antitrust violations. Therefore, plaintiffs sought, and the jury awarded, hypothetical lost profits on the sale of corrugated sheet. There was evidence that production facilities were modified to manufacture corrugated sheet during 1974, and Bonjorno estimated he could have sold 750,-000 pounds of corrugated culvert sheet in 1975, 1½ million pounds in 1976, and 2½ million pounds in 1977. (N.T. 205).

To allow the award of lost profits for a business that was never actually in operation, the court must first decide whether plaintiffs' entry into such line of business would have been a natural outgrowth of an established business or an expansion into a new market. *Heatransfer Corp. v. Volkswagenwerk, A.G.,* 553 F.2d 964, 988 n. 20 (5th Cir.1977), cert. denied, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). Relevant considerations include the "history of the expansion and growth patterns of other competitors in the relevant market," whether production facilities have to be varied significantly, and whether "customers for one unit would in all likelihood remain customers for other units." *Id.* Plaintiffs presented no direct evidence that the production of flat sheet was a natural outgrowth of pipe fabrication, but there was some evidence, if believed, that Columbia would have had other fabricators as sheet customers even though the customers for pipe would be direct users. There was evidence not only that the production facilities could be readily modified but that Columbia had so modified them and was equipped to manufacture and supply corrugated tube sheets after 1974 (N.T. 201–5). Therefore, the production of corrugated sheet could have been a natural outgrowth of Columbia's culvert business.

The court's second step is to determine whether plaintiffs presented sufficient evidence to allow the jury to determine that plaintiffs had an intention to enter the business and were prepared to do so. *Hayes v. Solomon,* 597 F.2d 958, 973 (5th Cir.1979), cert. denied, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980). There is much evidence if credited that plaintiffs had the requisite intention, but the record is not as clear that they were so prepared. The Fifth Circuit has listed four elements of preparedness: (1) the ability of plaintiff to finance the business and to purchase the necessary facilities and equipment; (2) the consummation of contracts by the plaintiff; (3) affirmative action by the plaintiff to enter the business; and (4) the background and experience of plaintiff in the prospective business. *Id., quoting Martin v. Phil-*

*lips Petroleum Co.*, 365 F.2d 629, 633–34 (5th Cir.), *cert. denied*, 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966).

Plaintiffs were unable to finance the purchase of the raw material (aluminum coil) needed to manufacture the corrugated sheet. (N.T. 202). Mr. Bonjorno claimed this was because prices of the finished pipe had been so depressed by Kaiser that it was not economically profitable for customers to buy corrugated sheet, make it into riveted pipe and sell it at a competitive price. (N.T. 186, 202). Bonjorno's assertion that the price of finished pipe was depressed by Kaiser was contradicted by other evidence presented by plaintiffs at trial.

Dr. Bowman testified that in a free and open market the selling price of pipe can be broken down as: 65% for aluminum costs, 25% for other production costs, and 10% for profits (N.T. 537). Taking the cost of aluminum obtained from Alcoa's price lists published during the relevant years (N.T. 538), Dr. Bowman calculated the hypothetical unrestrained selling price of·pipe. In Dr. Bowman's words, Kaiser's prices were "substantially the same" as those projected for a free and open market. (N.T. 1480). But the credibility of Bonjorno's explanation for Columbia's inability to enter the corrugated sheet market, whether he might have consummated a contract with Alcoa or sold corrugated sheet to Syracuse Tank, Lane Pipe or others and Columbia's readiness to enter the corrugated sheet business were all for the jury not the judge to assess.

## GOING CONCERN VALUE

■ Defendants argue that plaintiffs cannot recover damages for loss of Columbia's value as a going concern because Columbia had not "terminated its business ... as a consequence of an antitrust violation by Kaiser." (Defendant's Brief at 105). We agree.

■ A business that is forced to shut down because of antitrust violations is entitled to damages for loss of going concern value if proved. VonKalinowski, 15 *Antitrust Laws and Trade Regulation* § 115.03[4] (1978) (citing cases). This was recognized in our Opinion of June 17, 1981 which rejected an argument that the damages awarded were duplicative. The Opinion recognized that losses for past net profits and reduction in the value of a business are not duplicative absent unique circumstances. Defendants argued that plaintiffs' recovery of lost past profits and their receipt of $574,000 from the sale of Columbia's assets to Howmet Aluminum Corporation ("Howmet") necessarily fully compensated them. But the value of the business as a going concern might have exceeded the amount received from Howmet at the time of sale were it not for the anticompetitive conduct of the defendants. Therefore, an award of damages for loss of value as a going concern was held non-duplicative of actual losses or projected losses from 1974 to 1977 and non-duplicative of the money received from the sale of Columbia's assets to Howmet, so long as the damage award for going concern value was properly adjusted to reflect only goodwill, that is, the discounted present value of the estimated flow of future earnings.

However, that opinion was based on the erroneous impression that the sale of Columbia's assets to Howmet was in May, 1977 the end of the damage period. At that time we did not have the argument on the correct facts more fully developed on the present record: that Columbia was a going concern in May, 1977. Significant intervening factors interrupted the causal connection between plaintiffs' antitrust violations and the going concern value of Columbia as of December 20, 1978 so that it would have been improper to allow recovery for loss of profits as a going concern on that date. To the extent that we stated plaintiffs were entitled to both the lost past profits as of the time of the sale to Howmet (December 20, 1978) and the loss of value of the business as it would have been absent defendants' violation of law in May of 1977, we were in error because it is now clear that Columbia's business had not been terminated as of that date losses were allowed for its termination or destruction.

For recovery of "going concern" damages as well as any antitrust damages, it is well established that a plaintiff cannot prevail merely by proof that the defendant has violated the antitrust laws. He must prove that the violation had a causal relationship to the particular loss of anticipated revenue, that is, that the particular damage to plaintiff flowed from the conduct of the plaintiff. *Rea v. Ford Motor Company,* 497 F.2d 577 (3d Cir.1974), *cert. denied,* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1979). *See also, Freedman v. Philadelphia Terminals Auction Co.,* 301 F.2d 830, 833 (3d Cir.), *cert. denied,* 371 U.S. 829, 83 S.Ct. 40, 9 L.Ed.2d 67 (1962). Going concern damage is designed to compensate for the harm sustained when a business interest is unlawfully terminated as a result of an antitrust violation. Schneider, *Damages for Termination of a Business Interest,* 49 Antitrust L.J. 1295 (1980).

Antitrust cases concerning "going concern" or "goodwill" damages assume destruction, forced sale or other termination of the business as a necessary predicate to recovery. *Eiberger v. Sony Corp. of America,* 622 F.2d 1068 (2d Cir.1980) (termination of office equipment dealership); *Pitchford, supra* (termination of scientific instruments dealership contract); *Albrecht v. Herald Company,* 452 F.2d 124 (8th Cir.1971) (forced sale of newspaper carrier's route); *Lessig v. Tidewater Oil Co.,* 327 F.2d 459 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964) (termination of service station lease and dealer contract); *Osborn v. Sinclair Refining Co.,* 324 F.2d 566 (4th Cir.1963) (cancellation of service station lease and lessee's dealer sales arrangement); *Twentieth Century Fox-Film Corp. v. Brookside Theatre Corp.,* 194 F.2d 846 (8th Cir.), *cert. denied* 343 U.S. 942, 72 S.Ct. 1035, 96 L.Ed. 1348 (1952) (forced sale of 15-year lease on motion picture theater).

The calculation of going concern value is made as of the date the plaintiff's business was terminated or sold as a result of the illegal conduct. *Bogosian v. Gulf Oil Co.,* 561 F.2d 434, 455 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *Farmington Dowel Products Co. v. Forster Mfg. Co.,* 421 F.2d 61 (1st Cir.1970). As stated in *Farmington, supra,* "going concern" represents "the value which the business would have had at that time but for [the defendant's] illegal activity." 421 F.2d at 81. Accordingly, not only must there be a sale or cessation of the business but the date must be at the end of the damage period.

Plaintiffs operated their business as a going concern for approximately five months after May 31, 1977,[4] but plaintiffs elected May 31, 1977 as the end of the damage period. A government loan of $600,000 on or about that date permitted Columbia to continue in operation:

Q. Now you said that the end of the damage period for which you are seeking damages is May—is what, I'm sorry.

A. May 31, 1977.

Q. Why did you pick that as the end of the damage period?

A. It was just about that time or shortly thereafter that we received the proceeds of the EVA [sic EDA] loan, and the metal that the proceeds permitted us to purchase. Had it not been for that loan we would have then had to close our doors once and for all, and we felt that that represented a conservative and fair place to end the damages.

(N.T. 167).

Thereafter, plaintiffs, supplied with aluminum by Alcoa, operated their business as a going concern. Plaintiffs sold Columbia on December 20, 1978, over a year after May 31, 1977, the date plaintiffs concede to be the end of the damage period. The

---

**4.** Although Columbia suspended its production, it never ceased doing business altogether prior to May 31, 1977:

Q. Was Columbia Metal open and in business until at least May 31, 1977?

A. Yes, we were.

Q. Had you ever closed your doors?

A. No, we never had.

(N.T. 150—Bonjorno).

proceeds of a loan of $600,000 plaintiffs received from the Economic Development Administration of the United States Department of Commerce were used in the manufacture of steel and aluminum pipe:

Q. And after it got the $600,000, Columbia went back into operation, did it not?

A. Yes, it did.

Q. And during that time it made aluminum and steel pipe, did it not? . . .

A. We made some small quantity. We tried to make some small quantity of steel pipe, yes.

Q. And you made aluminum pipe?

A. Yes, we did.

Q. What company supplied you with aluminum?

A. Alcoa.

Q. How long was Columbia in operation after it got the $600,000?

A. Approximately five months.

Q. And you stopped production again?

A. Yes.

(N.T. 296–7).

Although the jury could reasonably have used May 31, 1977 as the end of the damage period for purposes of calculating lost profits, it could not as a matter of law apply this date as the commencement of "going concern" damages. May, 1977 was not the time of business termination but rather the time of its rejuvenation. By the time Howmet purchased Columbia the following year and began to reoperate as Howmet Columbia (N.T. 756–57), the going concern value of the company was substantially altered by the receipt of the government loan and numerous other market forces during the period of operation and thereafter.

With respect to going concern damages, the loan of substantial government funds in May, 1977 is not simply another factor to be accounted for by the jury in its overall assessment of the amount of damages due. The $600,000 EDA loan made it possible for Columbia to continue in operation as a going concern. For although Columbia ceased its production in 1975, it "kept its doors open" and renewed production in 1977 *as a result of the EDA loan.* (N.T. 167–69). A business which is in operation, as was Columbia in May, 1977, cannot receive damages for loss of profits it would have had as a going concern. Loss of going concern value is for a concern no longer going, that is, terminated by liquidation or forced sale.

Plaintiffs filed this action in January, 1974; at trial they chose May, 1977 as the conclusion of the damage period; they foreclosed their ability to recover damages for the time they continued to operate with government financing. The cessation of their operations five months thereafter and sale of the assets of a defunct operation one year after that cannot be attributed to Kaiser on this record. If the jury were to go beyond the damage period to the actual date of sale, charge Kaiser with responsibility for the sale and then assess going concern damages flowing from defendants' activities as of December, 1978, the jury would be forced to rely on prohibited speculations and guesswork.

If . . . the record discloses that the evidence on which the verdict is based is so critically deficient of proof of an essential fact needed to support the verdict that the jury could only have ventured a guess as to its occurrence, then a judgment notwithstanding the verdict is required.

*Hahn v. Atlantic Richfield Co.,* 625 F.2d 1095, 1099 (3d Cir.1980) *citing Denneny v. Siegel,* 407 F.2d 433, 442 (3d Cir.1969) and *Neville, supra* at 1210 n. 5.

The uncontested testimony of the plaintiffs that the EDA loan made possible the continued operation of the business beyond the damage period barred recovery for future loss of profits as a going concern as a matter of law even if the record is viewed in the light most favorable to plaintiffs. Therefore judgment for defendants notwithstanding the verdict will be entered as to the damages awarded in Interrogatory 4. We find it neither necessary nor appropriate to grant a new trial because of this issue. A new trial could not change the result as to these damages; the evidence as to the other items of damages and its con-

sideration by the jury was sufficiently distinct to permit their award even if the damages for loss of going concern value is set aside.

Defendants assert several other grounds for the deficiency of the evidence on going concern value, including that the capitalization of profits should have been on a pretax instead of after-tax basis and that the use of a 10% capitalization rate was too high for a company such as Columbia. Defendants argue these points persuasively but upon evidence not offered at trial or the proper subject of judicial notice at this time; without such evidence on the record it is inappropriate for the court to consider it in the context of post-trial motions. In any event, these matters are moot in light of our denial of going concern damages on other grounds.

## OTHER GROUNDS FOR JUDGMENT N.O.V.

Three other contentions of defendants in support of judgment in their favor notwithstanding the jury verdict for plaintiffs merit discussion.

■ Defendants objected to the admission of evidence on lost profits on sales beyond the relevant geographic area as stipulated by the parties.[5] The evidence of non-local sales which was the basis of plaintiffs' projections undeniably extended beyond the geographic area agreed to by the parties for the purpose of determining liability. But it was not agreed to as a limitation on plaintiffs' damage estimates. As long as there was some evidence that Columbia would have made sales beyond that geographic area, as there was, plaintiffs were entitled to have the jury consider those estimated sales. *Pitchford, supra* at 108–09.

■ Defendants contend that whatever the actual losses or lost profits, for all practical purposes, Columbia's business was terminated prior to 1977 so that damages could

not in any event be awarded beyond 1975. This issue was vigorously pursued on examination and cross-examination of witnesses for both sides and argued to the jury thereafter. The jury was instructed to award damages only for those years during which it was reasonable for Columbia to have continued to operate its business for purposes other than the claim of damages in suit. (N.T. 1540–41). The jury had an adequate basis upon which to decide the length of time for which damages might be awarded to plaintiff.

■ Defendants also contend that the judgment should be set aside because plaintiffs' theory of damages and the evidence adduced to support it contradicted the theory of liability based upon a "price squeeze." Among the joint activities of defendants relied on by plaintiffs at the trial on liability was a "price squeeze" by which KACC raised the price of aluminum sheet sold to other fabricators; aluminum sheet was transferred to KACSI at a price that permitted KACSI to sell Kaiser fabricated culvert at a low price with which other fabricators could not compete. That is, the difference between the price of the raw material charged by Kaiser and others, such as Alcoa, presumed to follow its lead, and the price charged for the finished product by Kaiser made it impossible for other companies not vertically integrated to sell the finished product competitively.

In this trial on damages, the calculations of plaintiffs' expert on prices in a free and open market tended to contradict the "price squeeze" theory. The prices he used for raw material (aluminum coil) were the actual prices charged by Alcoa in 1974–77 at which time it allegedly followed the lead of Kaiser. He used these prices to establish a fair selling price in a freely competitive market; those prices were admittedly nearly identical to the average direct selling price actually charged by Kaiser in the damage period. (N.T. 1478–80). Plaintiffs' expert also testified that the relationship

---

**5.** The stipulated area extended north through Rhode Island, south through northern Virginia, and west through eastern Pennsylvania.

between metal cost and the selling price of culvert pipe in a free and open market would have been 65% of sales; Columbia's financial statements for the years 1970 through 1975 showed a raw material cost approximating 65% of sales in each year. Thus, plaintiffs' evidence at the retrial on damages cast some doubt on a "price squeeze" as the basis for liability.

But a "price squeeze" was just one of a number of activities relied upon by plaintiffs at the first trial from which liability might have been found. There was sufficient evidence from which a jury might have inferred that KACSI: attempted to drive Columbia out of business; threatened to place a plant near Columbia if it purchased raw material from other than Kaiser and then later opened a plant in Delaware that had originally been planned for Virginia; charged lower prices from that plant, particularly in southern New Jersey; and extended credit to a former salesman of Columbia against the recommendation of KACSI's credit department. A jury finding on the anticompetitive significance of each of these acts was not requested and no special interrogatories were submitted as to which of the alleged categories of activities violated the Sherman Act or caused antitrust injury to Columbia.

At the first trial plaintiffs estimated damages by using four projection Methods (Methods C, D, E, and F). Method C (P–3012) projected Columbia's sales based upon government figures on new housing starts and new highway construction during the damages period. Method D (P–3013) projected Columbia's sales by utilizing defendant Kaiser's nationwide sales, while Method E (P–3014) used Kaiser sales from the New Castle, Delaware plant only. Method F (P–3011) relied upon Joseph Bonjorno's estimates of Columbia's potential sales and profits were it not for defendants' wrongdoing. At the time the post-trial motions were decided it did not appear liability and damage issues were inextricably interwoven. The trial on damages and liability had been bifurcated by agreement of the parties, so that there seemed little basis to believe the jury verdict would have been the result of compromise on the liability and damage issues. Because the liability and damage issues seemed sufficiently distinct and severable, a new trial on damages only was deemed fair to both parties and was so ordered. But *cf., Northeastern Telephone Co. v. American Telephone & Telegraph Co.,* 651 F.2d 76 (2d Cir.1981) (plaintiffs' failure to prove five of six alleged exclusionary activities and lack of certainty that jury based its verdict exclusively on the one remaining practice required all findings on liability set aside; a partial new trial limited to redetermination of damages held improper unless it clearly appeared the issue to be retried was distinct and separable).

Notwithstanding the vigor with which plaintiffs urged the unassailability of their damage evidence on their motion for reconsideration (later withdrawn), at the damage retrial plaintiff proffered a different expert and a different method for calculation of Columbia's hypothetical share of a freely competitive market. This new testimony on damages if heard by the liability jury might have influenced it to reject or discount the contention of a "price squeeze" by the Kaiser defendants. But this circumstance certainly does not compel the entry of judgment in defendants' favor notwithstanding the verdict. At most it reflects the unforeseen difficulties arising from a limited retrial on damages. Since the court rules now only on post-trial motions concerning the retrial on damages, this consideration is for the Court of Appeals.

The court has considered all other arguments for the entry of judgment notwithstanding the verdict and found them to be without merit.

## MOTION FOR NEW TRIAL

When a party moves for judgment notwithstanding the verdict or in the alternative for a new trial, and the court grants judgment notwithstanding the verdict, it is imperative that the court rule on the new trial request so that the litigation will not be needlessly protracted if the judgment is

thereafter vacated or reversed by the appellate court. Fed.R.Civ.P. 50(c); 15 Wright & Miller, *Federal Practice and Procedure* § 2539 (1971). Defendants advance four grounds for a new trial: that the conduct of plaintiffs' witnesses and counsel was prejudicial and improper; that the verdict was against the weight of the evidence; that the verdict was excessive; and that legal errors were committed throughout the trial.

■ Plaintiffs' counsel and witnesses during the retrial made some remarks irrelevant to damages issues and prejudicial to Kaiser. Notwithstanding extended discussion with counsel prior to trial and admonitions to counsel during the trial, the findings on liability were overstated or referred to unnecessarily. The testimony of plaintiffs' principal witness conveyed resentment of Kaiser which was not surprising. It seems that a trial limited to damages presented difficulties to counsel for both parties. But these were lapses from perfection in the course of lengthy, complex and vigorously contested proceedings. After reviewing the record as a whole and the instructions to the jury to consider only the issues on damages without prejudice or bias, we are of the opinion that the conduct of plaintiffs' counsel and witnesses does not warrant a new trial on damages.

■ A new trial may be granted on the ground that the verdict is against the weight of the evidence. *Neville, supra;* 6A *Moore's Federal Practice* ¶ 59.08[5] (1982). In terms of the amount of damages awarded, a new trial may be granted when the damages assessed by the jury are "so unreasonable as to offend the conscience of the Court." *Murray v. Fairbanks Morse,* 610 F.2d 149, 152 (3d Cir.1979). Stated either way, such a motion for a new trial is within the sound discretion of the court. *Id.* at 153. In exercising its discretion, the court may weigh the parties' evidence instead of looking only to whether the verdict winner has introduced sufficient evidence on each essential element to preclude judgment as a matter of law. *Moore's Federal Practice, supra.* Greater scrutiny of a verdict is

called for when the trial is "complicated and deals with a subject matter not lying within the ordinary knowledge of jurors." *Lind v. Schenley Industries, Inc.,* 278 F.2d 79, 90–91 (3d Cir.1960).

■ Even on a motion for a new trial judicial discretion must be exercised in a manner consistent with plaintiff's right to a trial by jury. The court may not substitute its own judgment for that of the jury merely because the judge as the finder of fact might have reached a different conclusion. That well established principle is not obviated simply because the trial is bifurcated.

> (N)either a trial nor an appellate court has the authority to substitute its judgment for that of the jury and thus usurp the jury's function as the principal finder of fact.

*Collins v. Signetics Corp.,* 605 F.2d 110, 115 (3d Cir.1979).

■ At the prior trial this court was guided by that principle. Based on the law of the case determined by the Court of Appeals, it found the evidence sufficient to support the jury's conclusion that defendants monopolized or attempted to monopolize the relevant product market in violation of Section 2 of the Sherman Act. The jury's determination on liability was not so against the weight of the evidence as to shock the conscience of the court. But the deficiency in plaintiffs' proof of damages convinced the court that the verdict as to damages should not stand. The evidence presented by the damage witnesses was incomplete, confusing and lacking in probative value and the factual basis for the estimates of losses was not made clear by the testimony. Since the damage award on that inadequate record had to be vacated, no explicit statement as to excessiveness was deemed necessary to the decision. After a retrial on damages at which plaintiff offered a different expert on damages and a new theory of the measure of damages or at least a new way of calculating damages, the court is faced with a difficult question: if plaintiff could not substantiate an untrebled award of $1,815,000 at the first trial on damages, what is the effect of an untrebled award of $3,189,313 at this trial?

The record on retrial was different and more fully developed. The evidence was sharply in conflict; the issues were pointedly raised by the direct testimony and extensive cross-examination. Almost all of Bonjorno's statements on the financial history of his company, the state of the market for the years in question, his future intentions and the prospects of Columbia required credibility determinations. The implausibility of deeming Columbia an operating business between 1975 and 1977 was effectively raised. The witnesses on behalf of plaintiffs were subject to impeachment for lack of knowledge, prejudice against Kaiser or interest in the outcome of the case. The assumptions of plaintiffs' expert on the size of the market, Columbia's projected 50% share of a local market and 30% of the entire market were challenged as ignoring viable competitors, inflating revenues and deflating expenses. But all of this was placed before the jury by a fair charge; its role as factfinder in weighing the contradictory evidence and inferences and in drawing the ultimate conclusions as to the facts cannot properly be ignored. Whether the trial judge would reach the same conclusions is irrelevant. So long as evidentiary support for their jury findings exists, "we perceive the resolution of the conflicting claims as the traditional responsibility of the jury." *Lehrman v. Gulf Oil Corp.,* 500 F.2d 659 (5th Cir.1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975). Therefore the court must refuse to set aside this verdict as excessive and respect the role of the jury in judging the credibility of the witnesses, assessing the weight given to expert opinions and resolving conflicting evidence.

Two judges have previously taken these questions from a jury. At the initial trial, a verdict was directed for defendants at the end of the plaintiffs' case on the ground that the evidence was insufficient to establish a market composed of aluminum culvert pipe or a monopolization of the relevant culvert pipe market and there was insufficient evidence of conspiracy in restraint of trade. The Court of Appeals reversed and remanded for trial. Following that trial, judgment on the verdict in favor of plaintiffs on liability and damages was set aside and a new trial ordered on damages only. Now this court is requested to set aside a second award of damages by another jury.

"Courts rarely grant a new trial after two verdicts upon the facts in favor of the same party." *Louisville & Nashville Railroad Co. v. Woodson,* 134 U.S. 614, 623, 10 S.Ct. 628, 631, 33 L.Ed. 1032 (1980). Wright and Miller, commenting on this dictum in *Federal Practice and Procedure,* Vol. 11 § 2803 at p. 35, observes:

> Of course there is no question but that a third trial may be ordered when the second trial, like the first, has been marred by a legal error. The more difficult question is whether the trial court may set aside successive verdicts as excessive, or against the weight of the evidence. That the power to do so exists seems perfectly clear, but it is equally clear that it is a power to be exercised only in the most exceptional cases. When two juries have reached substantially the same result, the possibility of a miscarriage of justice is very slight. [Footnotes omitted].

The usual circumstances weighing against the exercise of discretion in ordering a third trial on damages were well expressed by the trial judge in *Frank v. Atlantic Greyhound Corp.,* 177 F.Supp. 922 (D.D.C.1959), *aff'd,* 280 F.2d 628 (D.C.Cir. 1970):

> When a new trial is granted on the ground that the verdict is contrary to the weight of evidence, or on the ground that the damages awarded by the jury are excessive or inadequate, the trial judge takes this action to prevent what he finds to be a miscarriage of justice. This step is taken only in exceptional cases, as great weight must ordinarily be accorded to the verdict of a jury. If a second jury arrives at the same result as did the first, the trial judge may well pause before setting aside the second verdict. Under such circumstances the parties have had two trials. The fact that two juries in

effect agreed is entitled to a great deal of significance. Bearing in mind that a motion to set aside a verdict of a jury on the facts should be sparingly granted under any circumstances, *a fortiori* a second verdict reaching substantially the same result on practically the same evidence should greatly increase the hesitancy of the Court to award another trial. The possibility that a miscarriage of justice has resulted is greatly diminished under such circumstances. After all, there must be some point at which the granting of new trials in the same case should ordinarily stop. It may well be that if another new trial were granted, the same result would again be reached by a third jury.

177 F.Supp. at 923.

Here these circumstances are not present. The first new trial on damages was granted because there was a lack of an evidentiary basis for expert estimates not just because the verdict was against the weight of the evidence. Moreover, on retrial plaintiffs (perhaps because of the inadequate testimony of their previous damage expert), presented not only a different expert but a different theory of damages or at least a far different method for its calculation. So there has not been a second verdict reaching the same result on practically the same evidence.

But a trial judge should still pause before setting aside this second verdict because of the peculiar procedural posture of this case. The court's discretionary grant of a new trial is now limited to retrial on damages only. Defendants strenuously object to the fairness of this procedure (Defendants' Brief, pp. 18–60) and have preserved for appeal their argument that in practice if not in theory it was prejudicial error. It may be that if another new trial on damages were granted, the same result might again be reached by a third jury but would again be subject to the same objections, reviewable only on appeal. This court's determinations on liability will also be reviewed when this matter is again considered by the Court of Appeals. There may be no retrial at all but if there is to be one, guidance from the Court of Appeals on the determination of the liability issues and the scope of the retrial is in the interests of the administration of justice and the need of the parties for the final termination of this litigation.

For the above reasons, a new trial as to damages is denied. An appropriate Order follows.

## APPENDIX "A"

### INTERROGATORIES TO THE JURY

1. In what amount, measured in dollars and cents, do you find from the evidence that Kaiser caused actual losses to Columbia? None _____ $ *728,000* ͨͦ

2. In what amount, measured in dollars and cents, do you find from the evidence that Kaiser caused lost profits (exclusive of actual losses) to Columbia on the sale of aluminum culvert pipe? None _____ $ *742,520* ͨͦ

3. In what amount, measured in dollars and cents, do you find from the evidence that Kaiser caused to Columbia lost profits (exclusive of actual losses) on the sale of flat corrugated aluminum sheet? None _____ $ *80,000* ͨͦ

4. In what amount, measured in dollars and cents, do you find from the evidence that

Kaiser caused damage to Columbia for the
diminution in value of its business? None ____ $ *1,638,793* cc

*William H. Whettington*
Foreperson

Date: *12/2/81*

PLEASE NOTIFY THE MARSHAL WHEN DELIBERATIONS HAVE BEEN COMPLETED.

## ORDER

AND NOW, this 17th day of January, 1983, the Court of Appeals having granted a remand for the purpose of determining Kaiser's Motion for Judgment Notwithstanding the Verdict and Motion for New Trial filed by Kaiser, it is hereby ORDERED that:

1. The motion of defendants Kaiser Aluminum & Chemical Corp. and Kaiser Aluminum & Chemical Sales, Inc. for Judgment N.O.V. is GRANTED with respect to the jury award of $1,638,793 in response to Interrogatory Four as to damages and otherwise DENIED.

2. The alternative Motion of defendants for a New Trial is DENIED.

3. Judgment will be entered on the verdict of the Jury as follows:

| | | |
|---|---|---|
| Actual Losses | $ | 728,000 |
| Lost Profits (Pipe) | | 742,520 |
| Lost Profits (Sheet) | | 80,000 |
| | $ | 1,550,520 |
| Trebled According to Law | | X 3 |
| | $ | 4,651,560 |